[See Cases Nos. 15,974 and 15,975.]

## Case No. 15,974.

UNITED STATES v. O'SULLIVAN et al.

[9 N. Y. Leg. Obs. 257.]

District Court, S. D. New York. July Term, 1851.

INDICTMENT—MOTION TO QUASH—STATUTORY OFFENCES—NEUTRALITY LAWS—CONSTRUCTION AND EFFECT—INTERNATIONAL LAW.

1. A motion to quash an indictment is a proper mode of taking objections to it for want of form or substance.

2. It is, however, discretionary with the court whether it will quash an indictment for defect of form.

3. It is generally sufficient to describe a statutory offence in the words of the statute creating it, particularly so in cases of misdemeanors.

[Cited in U. S. v. Quinn, Case No. 16,110.]

4. U. S. v. Smith [Case No. 16,342], and U. S. v. Burr [Id. 14.693], are precedents establishing the sufficiency of such indictment under the 5th section of the act of June 5, 1794 [1 Stat. 384].

5. The 6th section of the act of April 20, 1818 [3 Stat. 449], is substantially a transcript of that. In U. S. v. Henderson, an indictment under this section, corresponding to that of U. S. v. Burr, decided to be good.

6. The particulars constituting the offence are matters of evidence and not of pleading.

7. The indictment in the present case *held* to be good in point of form.

8. The law of nations no less interdicts warlike aggressions made directly upon a nation at peace than the aid of one belligerent against another.

9. They are just cause for reprisal and war. What a nation may not lawfully do in its public capacity in respect to others, the citizens or subjects of it ought not to do in their private capacity.

10. Q. Whether they can be restrained or punished by the judicial tribunals therefor, under the law of nations, as part of the common law of the land?

11. The United States government is the first amongst civilized nations which compelled, by positive law, its citizens, individually, to observe the law of nations towards friendly powers.

12. The act of 1794 was not intended as merely a neutrality act.

13. The president invoked the legislation of congress for further objects than the means of maintaining the neutrality of the United States between belligerents solely.

14. The act has been accepted by the United States government and judicial officers ever since its enactment, as extending to warlike expeditions from this country, not intended to aid one belligerent against another.

15. The cases of U. S. v. Smith and U. S. v. Burr clearly evince that understanding of it.

16. Q. Whether a direct attack by the United States, or by individuals from the United States, on a Spanish province in America, is properly a breach of neutrality, though Spain be at the time at war in Europe with a power with whom the United States is at peace?

17. The act of 1818 has been uniformly treated by the executive department, and by judges of the United States courts, as embracing warlike enterprises set on foot in this

country against a friendly power at peace witn all the world.

18. Such, also, according to established rules of construction, is the interpretation to be put upon the language of the act.

19. The matters charged in the indictment constitute a violation of the statute, and the motion to quash the indictment denied on both grounds.

[This was an indictment against John L. O'Sullivan and others for preparing and setting on foot, etc., a military expedition against the Island of Cuba. Heard on motion to quash.]

J. Prescott Hall and Ogden Hoffman, for the United States.

F. B. Cutting and J. Van Buren, for defendants.

BETTS. District Judge. The indictment in this case is founded upon the 6th section of the act "in addition to the act for the punishment of certain crimes against the United States," passed April 20, 1818. The provisions of the section are "that if any person shall, within the territory or jurisdiction of the United States, begin or set on foot, or provide or prepare the means for any military expedition or enterprise, to be carried on from thence against the territory or dominions of any foreign prince or state, or of any colony, district or people, with whom the United States are at peace, every person so offending, shall be deemed guilty of a high misdemeanor." The indictment, in ninety-seven counts, charges the defendants, by themselves and in conjunction with others, with having, within the United States and at the city of New York, begun a military expedition and enterprise, and with having provided and prepared the means for a military expedition and enterprise, to be carried on from thence against Cuba, the territory and dominion of the queen of Spain, and also against the people of the territory and colony of Cuba. Each count purports to charge the offence in the words of the statute, and the variations between them are, mostly formal only and relate to the different appellations given in the indictment to the Island of Cuba, or place against which the expedition was destined. The defendants move to quash the indictment, for want of averments proper and necessary to be pleaded to by them, or on which any judgment of the court, in case of their conviction by a jury, can be rendered. These objections relate only to the form and structure of the indictment, and if well taken do not dispose of the accusations preferred against the defendants, as they may be obviated by a new bill correcting the deficiencies of the present one.

The essential point raised by the motion, and discussed with great earnestness and force on the part of the defendants, covers their liability to prosecution under any form of indictment, for the act alleged to have been committed by them. The position taken on the merits is, that the act of congress relates solely to the maintenance of a state of neutrality by citizens of the United States, in respect to foreign states in amity with us, but at war with each other. It will be proper to consider in the first place the sufficiency of the indictment as framed, for if that be vitally defective the defendants must be discharged from the present prosecution, and it will be labor lost to investigate and decide the main question as to the force and operation of the statute.

A doubt was suggested preliminarily on the part of the prosecution, whether it is competent for the defendants, after having plead the general issue to the indictment, to withdraw that plea and move to have the bill quashed; or even if the motion to quash is an appropriate one, to bring up merely technical points of pleading. It is true, the defendants, when arraigned, entered their pleas of not guilty to the indictment, but it was without the presence or advice of their counsel, and under the assurance of the court that the plea should no way prejudice their rights, and that they should have the privilege of every defence to the indictment, when their counsel came into court, that they were entitled to by law before the plea of not guilty was interposed. The authority of the court, to control the order of pleading at its discretion, cannot be doubted.

The doctrine of the English books is, that by the common law the court may, in discretion, quash an indictment for such insufficiency, as will make any judgment whatsoever, given upon any part of it against the defendants, erroneous. Hawk. P. C. bk. 2, c. 25, § 146; 1 Chit. Cr. Law; Archb. Cr. Pl. p. 64, § 8; Bac. Abr. Indict. K; Com. Dig. (Day's Ed.) Indict. H. and notes. The American authorities recognize the principle fully. Whart. Cr. Law, pp. 130, 61, 7, § 1; Barb. Cr. Law, 306, c. 7. But Hawkins says, the judges are in no case bound ex debito justitiæ, to quash an indictment, but may oblige the party to plead or to demur to it. Hawk. P. C. bk. 2, c. 25, § 146.

The first count of the indictment charges, that the defendants, on the 23d day of April, 1851. within the territory and jurisdiction of the United States of America, to wit, at the city of New York, in the Southern district of New York, and within the jurisdiction of this court, with force and arms did, in conjunction with some other persons to the jurors unknown, begin a certain military expedition, to be carried on from thence against the territory of a foreign prince, to wit, the territory of the queen of Spain, the United States then and there being at peace with the said queen of Spain. The twelve counts succeeding, also count on the words "begin a military expedition"; and state the offence substantially in the same language as the first count, varying from it in some instances in averring the military expedition was to be carried on from the United States, and also in naming Cuba as the place against which it was to be carried

on; and giving that sometimes the appellation of territory, dominion, colony or district, of the queen of Spain, or of the people of Cuba. Similar allegations are made in the counts charging the setting on foot a military enterprise, to the 34th count inclusive. From the 35th to the 75th counts inclusive, the defendants are charged with having provided the means for carrying on a military expedition or enterprise, and from the 76th to the 97th counts inclusive, with having prepared the means for the same.

The most material exceptions taken on the part of the defendants to the frame of the indictment, are: 1. That in the 34 first counts it is not stated what acts were done by the defendants, to begin or set on foot a military expedition or enterprise, nor what constituted or composed the expedition, and rendered it military. 2. That the defendants are not charged with having begun or set on foot the expedition or enterprise, with criminal intent, or knowing it to be a military one. 3. That it is not averred from what place in particular in the United States, nor at what time, the expedition or enterprise was to be carried on. 4. That the counts from 75 to 97, do not charge any criminal intent, or that the defendants had any knowledge that the means prepared and provided were to be employed in carrying on a military expedition. 5. That all the counts want the fulness and precision required by law, in describing a criminal offence, and connecting any person with its commission.

These objections and various minor ones, raised in the course of the argument, fall under two general considerations: 1. Whether it is legally sufficient in an indictment on this section of the statute, to describe the offence in the words of the act, and if so: 2. Whether the pleading in the present case fulfills the spirit of the rule, by designating times and places and acts, with the distinctness and precision necessary to bring the defendants within the charge of having violated the law.

In England, it is required that indictments for offences made so by statute, when of the degree of felony, shall contain the same formality and precision as on common law offences, and it is not enough to pursue the description of the offence given by the statute, but the special acts done, or ingredients of the offence, must be stated in the indictment. 1 Chit. Cr. Law, § 22; Archb. Cr. Law, 50; Starkie, Cr. Pl. 235. It is unnecessary to inquire whether the United States courts have adopted, even in cases of felony, the rigor of the common law rule of pleading in this respect. I apprehend the general practice is to charge statutory offences, carrying with them an infamous punishment, in the words of the statute constituting the offence; for instance, an assault with intent to kill, or commit a rape, or with a dangerous weapon, or making a revolt. Be this as it may as to felonies, the rule is clear and explicit in respect to misdemeanors, that it is generally enough in an indict-

ment to describe the offence in the words of the statute creating it. U. S. v. Kelly, 11 Wheat. [24 U. S.] 418, where the indictment charged the defendant with an endeavor to make a revolt, and it was held by the supreme court to be a sufficient description of the offence. In U. S. v. Gooding [12 Wheat. (25 U. S.) 460], the defendant was indicted for fitting out a vessel to be employed in the slave trade—the act of congress of April 20, 1818, having made it an offence so to do. Exception was taken that the particular acts done by the defendant were not specified. There would be, apparently, in those cases, strong reasons for requiring such statement, that it might appear upon the record an offence had been committed, and also to enable the defendant to be prepared for his defence. But the supreme court held the indictment sufficient. [U. S. v. Gooding] 12 Wheat. [25 U. S.] 460. So, on an indictment under the 3d section of the act upon which the present indictment is founded, the defendant was charged with being knowingly concerned in fitting out a vessel with intent that she should be employed in acts of hostility, &c., &c., describing the offence in the language of the statute. The court decided that it was sufficient for the indictment to charge the offence in the words of the statute. U. S. v. Quincy, 6 Pet. [31 U. S.] 465. The decision in the last case has more pertinency and weight on the present question, because it had reference to a section of this very act, and because it declares a mode of describing the offence, no less general and indistinct than the present, to be all that is required in law. In U. S. v. Mills, 7 Pet. [32 U. S.] 142, the court again assert the general rule to be, that in indictments for misdemeanors created by statute, it is sufficient to charge the offence in the words of the statute. The court further say there is not that technical nicety, as to form, necessary, which seems to have been adopted and sanctioned by long practice in cases of felony, and, with respect to some crimes, where particular words must be used, and no other words, however synonymous they may seem, can be substituted.

These doctrines are applied in the U. S. circuit courts, in indictments for misdemeanor, in a spirit as broad and liberal as that indicated by the supreme court. U. S. v. Hayward [Case No. 15,336]; U. S. v. La Coste [Id. 15,548]; U. S. v. Martin [Id. 15,731]; U. S. v. Lancaster [Id. 15,556]; Whart. Prec. Ind. 608, note. And it is worthy of notice that, even in civil actions upon penal statutes, the United States supreme court hold it sufficient to charge the offence, or plead matter of defence in the words of the statute. [Locke v. U. S.] 7 Cranch [11 U. S.] 339; [Gelston v. Hoyt] 3 Wheat. [16 U. S.] 330. The counsel for the defendants suppose a decision of the supreme court of this state has marked a qualification not inconsistent with the rule declared by the supreme court of the United States, but which restores to indictments upon statutes a

more just and desirable conformity to those founded upon common law offences. People v. Taylor, 3 Denio, 96. I do not understand the decision in that case conflicts, in any essential particular, with those above cited; on the contrary, it seems to me to confirm, in the strongest terms, the principles upon which they rest. It was an indictment for setting on foot and for carrying on a certain lottery. The state statute made it an offence for any person to open, set on foot, carry on, promote, or draw any lottery, &c. 1 Rev. St. 665. The court say, all the counts based upon a lottery state the purpose for which the lottery was made, in the words of the statute, and that is enough to show that it was an illegal lottery. The counts also follow the statute in severally stating what was done by the defendant, to wit, that he did "set on foot," "carry on" and "open" a certain lottery, and in this are sufficient; neither of the counts contains any description of the lottery beyond a general statement of the purpose for which it was made. For the latter reason, the first, third and fourth counts were pronounced bad, but the second count was held good, because it had the averment that "a more particular description of the lottery was unknown to the jurors." This decision may perhaps be regarded as in a degree shaken, if not overruled, by that of the court of appeals in Charles v. People, 1 Comst. [1 N. Y.] 180, in which it was held that an indictment, under the same statute, for publishing an account of a certain illegal lottery was good without other description of the lottery or the acts done. The statute is "that no person shall by printing, &c., &c., publish an account of such illegal lottery." The case of Com. v. Dana, 2 Metc. [Mass.] 329, seems to stand opposed to the reasoning and conclusion of the court in People v. Taylor, as to the necessity of filling out the meaning of the legislature by averments in the indictment beyond the language of the statute. See, also, 5 Pick. 41, 42; 6 N. H. 53. Be that as it may, whether an indictment under the New York statute for setting on foot, or publishing an account of a lottery, must give the name of the lottery or an excuse for not setting it forth, the case of People v. Taylor is pointed and distinct that no other description of setting on foot, or carrying on, or opening a lottery. is necessary than to aver in the words of the statute that the defendant did set on foot, etc., etc. The counsel also call the attention of the court to the state act of 1849, c. 278 (Sess. Laws, 403), making it a misdemeanor "to manufacture, cause to be manufactured, sell or expose, or keep for sale or gift or part with 'slung shot,'" stating that it has been adjudged by the criminal court for this city, that an indictment under this act following its words is bad, and that the intent of the party charged. to use such slung shot, must be averred and proved. The decision undoubtedly rests upon the doctrine that when the statutory description does not give every necessary ingredient of the offence,

then the indictment must aver the facts necessary to constitute the crime, and such as show a scienter and criminal intent on the part of the accused. Archb. Cr. Pl. 64; Barb. Cr. Law, 291. But such is not the case under the statute in question. The act charged to have been done by the defendants imports a knowledge of its criminality, and the intent necessary to constitute the offence described by the statute. To begin, or set on foot a military expedition from the United States against another nation, necessarily imports by force of the expressions themselves that the act was done understandingly, both as to the object and purpose for which the military expedition is prepared or set on foot, and the end it is to answer or accomplish.

After this brief consideration of the general rule in relation to indictments upon statutes for misdemeanors, and the exposition of the supreme court of the United States, of an indictment drawn in the language of the 3d section of the statute in question, it may be proper to advert to the evidence supplied in the action of the judiciary on the section specially under discussion, to ascertain whether any interpretation has been put upon it, which will throw light upon this inquiry and indicate the sense in which this act has been understood and executed. This is a re-enactment of the 5th section of the act of June 5, 1794, with the addition of "or of any colony, district or people," after foreign prince or state, with whom the United States are at peace. The description of the offence and the punishment are otherwise identical. In April, 1806, indictments were presented in the United States circuit court for this district, against Samuel G. Ogden and William S. Smith, founded upon the 5th section of the act of June 5, 1794. The indictments were very concise, the parties were indicted separately. Trial of Smith and Ogden, vi, ix.[1] The first count charges that Ogden on the 10th day of January, 1806, at the city of New York, within the district of New York, and within the jurisdiction of the United States, did begin a certain military expedition to be carried on from thence against the dominions of a foreign prince, to wit, the dominions of the king of Spain, the United States then and there being at peace with the said king of Spain. The second count, with the same preamble, avers that Ogden "did set on foot a certain military enterprise, to be carried on from thence against the territories," as before. Third count same as second, except alleging it to be against the province of Caraccas in South America, then and there being the territory of the king of Spain. Fourth count, same preamble, did provide the means, to wit, one ship or vessel called the Leander, for a certain other military expedition to be carried on from thence against the dominions of the king of Spain. Fifth

---

[1] [Cases Nos. 16,341a–16,342b.]

count, same as last, and after Leander, adding, "one hundred and fifty men, thirty cannon, five hundred muskets, four thousand pikes, thirty tons of cannon balls, one hundred swords, one hundred and fifty quarter casks of gunpowder" for a military expedition to be carried on from thence against the province of Caraccas, etc. Sixth, and same as last, except place, to be carried on against "the dominions of some foreign state to the jurors unknown." Seventh, same preamble, "did set on foot a certain other military enterprise to be carried on from thence against the dominions of some foreign state, to the jurors unknown." The indictment against Smith, has the three first and last counts the same as that against Ogden; the fourth, fifth and sixth counts also the same with those against Ogden, except in charging the means prepared and provided to be thirty men and $300 in money. The prosecution in those cases touched closely upon some of the exciting topics of party politics, and they were pursued and defended with an acrimony better befitting the arena of party strifes than a tribunal of justice. The first talents of the New-York bar appeared for the defence, and every point was combated with all the astuteness and ardor causes so circumstanced would be apt to engender in the then state of public feeling. Messrs. Emmet, Harrison, Colden and O. Hoffman, conducted the defence, and it is fair to infer that no tenable point of objection to the prosecution derivable from the law or the facts would escape the sagacity and experience of such counsel. Pleas in abatement were interposed, and motions made to quash the indictment, because improper testimony had been laid before the grand jury. Trial of Smith and Ogden, xxiv., xiii.[1] A most earnest and protracted argument was addressed to the court to compel the attendance as witnesses of the secretary of state, and other heads of the departments of the general government, and the most earnest efforts renewedly made to postpone the trials; but on the various motions and discussions, it was never suggested that the form of the indictment was objectionable, either in not describing properly the offences charged to have been committed, or averring the times and places they were to be perpetrated. It is to be remarked that Mr. Hoffman had been attorney general of the state of New York, Mr. Harrison United States attorney of this district, and the eminence of Messrs. Emmet and Colden in all branches of juridical learning, gives to the omission of such counsel, to raise an objection to the indictment in form or substance when so pressed by the case, the force of the strongest argument in its support and vindication of its legal sufficiency. On the 9th of September, 1807, after Col. Burr had been acquitted on an indictment for high treason, he was arraigned at

Richmond, Virginia, before Chief Justice Marshall, on an indictment under the same section, the 5th section of the act of June 5, 1794, for beginning and setting on foot a military expedition against Mexico. From the synopsis of the indictment given (2 Burr, Tr. 538) it appears to have been framed nearly identically with those against Smith and Ogden. The offence is charged in the words of the act and in no other way; "did begin a military expedition," "did set on foot a military expedition and enterprise," against the territory and dominions of the king of Spain, against the province of Mexico, and against the territory and dominions of a foreign state unknown. The history of the trials of Col. Burr affords an exhibition of acumen, learning and perseverance in pressing every topic of defence supplied by legal skill and experience which is not surpassed by any case on record. Himself a jurist of pre-eminent distinction, and assisted by Edmund Randolph, Wickham, Charles Lee, Robert Goodlee Harper, Luther Martin, Botts, &c., some of them leading lawyers of the age, the prosecutions were opposed at every point of advance, when there seemed the faintest ground for objection, and thus, for a series of weeks, was maintained a struggle against the cases set up by the government · against him. Both indictments were defeated, but it is certainly remarkable, if the one, now in question, was open to the objection that the offence was not sufficiently described, and that it was otherwise defective in form or substance, that ground should not have been then taken against it. And the more so, because it was most strenuously insisted that Col. Burr could not be properly prosecuted in that district for the offence; and if he could, that he ought not to be subjected to trial at that time, or at all, after his acquittal on the capital charge. In the unremitted efforts to get rid of the indictment or of the trial, it was never suggested by. Col. Burr or either of his counsel, nor by the court, that the indictment in its then shape could not be maintained. It was treated in all the motions and arguments as sufficient and valid, in point of form, and the court, in a carefully prepared opinion on the motion to reject evidence offered under it on the part of the United States, declares "that any legal testimony which shows the expedition to have been military or to have been designed against the dominions of Spain, may be received." 2 Burr, Tr. 539, and Append. This case, surrounded with its attendant circumstances, augments the force of the implication derived from the trial of Smith and Ogden, that there was no valid and sound objection in law to the sufficiency of the indictments, in the form in which they were presented.

The argument, from the usage of the courts and the undoubting acquiescence of the profession in support of the sufficiency and propriety of setting forth the offence in question

---

1 [Cases Nos. 16,341a–16,342b.]

in the words of the statute, is further strengthened by the recent proceedings in the United States circuit court for the District of Louisiana. An indictment was presented in that court, on the 6th section of the act of 1818, against Henderson, for beginning and setting on foot a military expedition against Cuba. I have been furnished with the form of the indictment, and find it corresponds almost exactly with those in the cases of Smith and Ogden and of Col. Burr. No demurrer or motion to quash the indictment was made on the part of the defendant; he went to trial upon it as sufficient in point of form and substance. On the trial, evidence offered by the United States of circumstances tending to show the beginning and setting on foot a military expedition by the defendant was objected to, because those circumstances were not set forth and averred in the indictment. The presiding judge, in a very carefully prepared and able opinion, overruled the objection and held that it was sufficient to charge the offence in the words of the statute, the particulars constituting the offence were matters of proof and not of averment. This case then also shows that in the understanding of the bar, the indictment was not open to exception upon its face, because of insufficiency in stating the offence, and it further shows the deliberate judgment of the court upon the precise point, that the objection cannot avail against the admissibility of evidence under the averment, so that it accordingly is sufficient as a description of the offence and also as notice to the accused of the matters he must be prepared to meet and defend himself against.

It was unnecessary in the present indictment to aver that what the defendants did, was done by them with a criminal intent or with knowledge that it was a criminal offence. The statute does not make these particulars a part of the description of the offence, but the definition given imports a criminal knowledge and intent in those committing it. To begin or set on foot, or supply means for a military expedition from the United States to be carried on against a nation at peace with the United States, as already intimated, implies in those concerned in such an adventure, a purpose and intention to do that act understandingly and intentionally, which is pronounced by the law to be a crime. No further charge of a criminal design can be required when not exacted by the terms of the statute, than to state a course of conduct necessarily importing a purpose to do those acts which are forbidden by law. The indictment against the defendants comports in all important particulars and nearly verbatim with those heretofore presented in the three different circuit courts of the United States as above referred to. I do not find, except in one count, the omission of any part of the description of the offence given by the statute, nor the insertion of averments variant from those

employed in the preceding cases. In the 19th count, it is not asserted that the military expedition was to be carried on from any place. This is doubtless a clerical error, but it is fatal to the count. In some instances the allegation is, that the expedition or enterprise was to be carried on "from thence" (in the words of the statute), in some, "from the United States." The argument is that the grammatical relation of the words "from thence" in several counts, is to "the city and district of New York" and not to the United States. The meaning of the statute undoubtedly is, that the expedition shall be intended to be carried on from the territory or jurisdiction of the United States, but I apprehend an averment merely that it was to be carried on from the district of New York, would be precise and certain enough, as the court must judicially know that place to be within the jurisdiction of the United States. But all the counts add the allegation that the act was done within the jurisdiction of the United States, to wit, setting on foot, beginning, &c., to be carried on from thence. No further certainty is necessary in my judgment, to render these counts unexceptionable. The words "from thence," as used in this statute, mean from the United States and are precisely equivalent to the territory or jurisdiction of the United States.

It is questionable, in my mind, whether it is allowable to state in an indictment, that the military expedition was to be carried on against the territory or dominions of a prince or state, to the jurors unknown. That fact, it appears to me, should be ascertained and explicitly averred by the grand jury, and without a knowledge enabling them to present that fact, they could not properly charge the crime to have been committed. It is nearly as incongruous, in view of the object of the statute and the description there given of the offence, for the jurors to say, it is unknown to them against what place the expedition was designed, as for them to have asserted that the defendants did some kind of act, but whether it was beginning or setting on foot a military expedition, was unknown to the jurors. If the jurors do not know against what nation the expedition was to be directed, how can they know it was a nation at peace with the United States? I should certainly, if not controlled by authority or precedents, hold it to be an indispensable part of the description of this offence, to name the prince or state whose territories or dominions were to be invaded. These same averments, were, however, employed in the three indictments referred to, and without objection, and were held allowable in civil proceedings by the U. S. supreme court. Locke v. U. S., 7 Cranch. [11 U. S.] 339; Gelston v. Hoyt, 3 Wheat. [16 U. S.] 329. And I shall, therefore, not decide on this motion, that the omission to name the friendly power against whom the enterprise is designed, is fatal to the indict-

ment, but leave the question to be presented more solemnly by demurrer or in arrest of judgment. In my opinion, it is not necessary to designate the particular part of the United States from which the expedition is to be carried on, nor the time when. These are matters collateral to the gist of the offence. That consists in concocting a military expedition within the United States, with a hostile purpose towards a friendly nation. It is no part of the description of the offence, that the expedition or enterprise shall have left the United States, and, accordingly, it can be of no essential importance to allege the particular point contemplated for its departure. The guilty purpose must be proved, and the guilty acts to be all done within the district of New York, and it no way qualifies or affects the character of these particulars, whether the defendants intended to put off the expedition at Castine, or Galveston, or any intermediate point.

In my opinion the motion to quash the indictment for want of proper form, must be overruled. I have given this point of the case a much more extended consideration than its importance or difficulty would seem to demand. I have been induced to bestow more attention upon the structure of the indictment because of the extremely able argument of the counsel for the defendants on the subject, and because this particular branch of criminal pleading has not before been brought distinctly in judgment in the courts of the United States. Independent of the controlling authorities cited in support of the mode of describing the offence pursued in this case, I think on general principles the succinctness and conciseness of description adopted here should be upheld in preference to having the pleadings crowded with multifarious details of facts, a great portion of which must necessarily be conjectural and thrown into the averments, to meet any possible state of proof that might chance to arise on the trial, and would not accordingly afford a specific notice to the accused of the facts relied on by the prosecution for their conviction. In libels of information on a statute to enforce forfeitures, and in defence for seizure of property as forfeited, pleading according to the terms of the statutes is held sufficient notice to the claimant and description of the offence. [Locke v. U. S.] 7 Cranch [11 U. S.] 339; [Gelston v. Hoyt] 3 Wheat. [16 U. S.] 339. To aver that the defendants set on foot or begun a military expedition at New York, will apprise them as distinctly of the matter of accusation as to set forth a schedule of facts, which may enter into the preparation of such expedition.

The multifariousness of details might more embarrass than aid the defence, as it would be obvious to the defendants, that although a hundred particulars might be enumerated in the indictment, the public prosecutor on the trial might limit his evidence to a single one, and might prove that by the admissions or declarations of the defendants themselves. There is no advantage afforded a party defendant by a multiplicity of notices ranging over an indefinite series of incidents and circumstances. The law wisely leaves these to the proof, and discards them from the pleadings. In the present case in my opinion, it is matter for proof and not of pleading, to show what was done by the defendants in beginning and setting on foot the military expedition charged against them.

The consideration of the main question on the merits, although the one of greatest magnitude in point of principle, will be made as brief as may be consistent with a distinct expression of the views of the court upon it. The motion to quash the indictment most legitimately attaches to the objection, that the acts charged upon the defendants constitute no violation of the act of congress, and do not fall within the criminal jurisdiction of the court. The authorities concur in the doctrine that if the matters alleged in the indictment are not punishable by law, the indictment will be quashed. Whart. Cr. Law, 131; Archb. Cr. Law, 64; Bac. Abr. Indict. K.

The position of the defendants' counsel is, that the acts of June 5, 1794, and of April 20, 1818, are neutrality acts, intended to have operation only in case of war between nations in amity with the United States, and to prevent the citizens of the United States committing acts favoring one, and hostile to another belligerent. The argument is, that the passage of the act of 1794 was induced by the relations then existing between the United States, France and Great Britain, and more especially to check the mischief with which this country was threatened through the pretensions and conduct of Mr. Genet, the French minister. That the legislation of congress being invoked only to the end to declare and enforce our neutral obligations, all the provisions of the statute must be construed in subordination to that purpose, and the 5th section be regarded no more than a restriction upon our citizens in respect to belligerent powers, and not a substantive and independent enactment, declaring a class of offences not known to our own laws, nor recognized by the laws of nations. It is further insisted that the construction claimed for the act of 1794 must be extended to the act of 1818, the latter being a transcript, substantially, of the former; and, also, that the incorporation in it of the act of 1817, which was, by title, avowedly a neutrality act, and nothing more, would tend to characterize the one adopting it, as a neutrality act also.

To determine the justness and pertinency of this train of reasoning, it may be important to look more closely to the foundation of the act of 1794, and endeavor to ascertain whether, in one feature more than another, it rests upon any admitted doctrine of the

law of nations. It is an infraction of that law for a friendly power to interfere in case of war, between other nations with whom she is at peace, and render aid to one belligerent against another, and such act may become a justifiable cause for reprisals and war on the part of the nation so injured. Mart. Law Nat. bk. 8, c. 6; Wheat. Hist. Law Nat. 453; 4 Gro. De Jure B. lib. 3, c. 17, § 3. But there is no conceded doctrine of that law, nor any uniform usage of nations which prohibits the citizens and subjects of a neutral power enlisting in the service or taking part with either belligerent. This, so far as it falls within the notice of publicists, appears to be a matter of municipal regulation, left to the authority of each particular government over its own subjects, and not to come within the cognizance of public law. Id. c. 18. Indeed, it has been made a question, and one which the United States felt themselves compelled to discuss, whether belligerent powers had not a right to enlist and enrol men in a neutral country to carry on war against nations at peace with such neutral, without impairing by those means the neutrality of such country. Wheat. Hist. Law Nat. 471, 472. The United States government properly repudiated the pretension and held itself bound by its relations to friendly powers to restrain within our territories the exercise of any such privilege. Letter of Jefferson to Gov. Morris, August 16, 1793 (3 Jefferson's Writings, 269). Still it is doubtful, whether the argument proves more than that the restraint devolves upon the municipal authority by force of the local or common law, and should be enforced by it.

The law of nations, which interdicts a neutral power, becoming a party in a war between others with which it is at peace, springs out of and rests upon that code of natural law which recognizes and declares the right of every nation to remain at peace, and not to be unjustly or wrongfully driven into war by the aggressions of another. Under this doctrine non-interference is as high a duty as neutrality. The right of every people to the undisturbed possession of its territory and independency, and to repel by force every encroachment upon either, is justly placed by writers on the ethics of national law, first amongst those natural rights which it is the end of public law to recognize and preserve. Mart. Law Nat. 69; 1 Wildm. Int. Law, 50; Wheat. Hist. Law Nat. p. 4, c. 1; Vatt. Law Nat. § 64; Id. 216, 217, 369. It is denounced as an act of wrongful aggression for any other power to interfere with the independency of a state or people, however objectionable may be its existing form of government or mode of administering it. 1 Kent, Comm. 21; Vatt. Law Nat. 49, 50, 198, 203. Chancellor Kent seems inclined to sanction the privilege of one nation to interfere in the domestic disturbances and insurrections of another, in behalf of the oppressed and wronged portion of the nation, when requested by it so to do. 1 Kent, Comm. 21–23. But the doctrine is controverted with great strength of argument and authority by a later writer, who repudiates as wholly untenable the notion that one nation is clothed with authority to adjudge upon the internal affairs of another or to intermeddle with them for any cause other than the necessity of its own defence. 1 Wildm. Int. Law, 50, 57; 1 Sparks' Washington, 382 (opinion of Gen. Washington).

The first administration of the government of the United States found itself called upon at an early day, in taking its place in the family of nations, to enforce an observance of the rules of public law in its transactions with two belligerents, each of which was united to this country by numerous ties of interest and sympathy. 2 Marshall's Life of Washington, 283, 287, 288; 1 Gibb's Administration of Washington and Adams, 140. The course it would pursue in relation to those engaged in war was explicitly announced by the proclamation of President Washington, dated April 22, 1793. 1 Wait, St. Pap. 44. The instructions of the treasury department of August 4, 1793, adopted by order of the president, framed a system of regulations to govern the conduct of its public officers, in enforcing the spirit of the proclamation in the ports and harbors of the United States. Id. 45. And similar directions were given the governors of states, and the troops of the United States, in respect to the interior of the country. 2 Marshall's Life of Washington, 334, 355. The president, in his speech at the meeting of congress, Dec. 3, 1793, calls for statutory enactments to sanction and enforce the principles thus promulgated by the government. Wait, St. Pap. 40. But to maintain our neutrality merely between belligerents was not all the exigencies the case called for, nor the whole that was contemplated by the government. It is manifest it did not mean to limit its action to a fulfillment towards other nations of its obligations in respect to them as belligerents alone. Its policy was of a broader character, and befitting the principle upon which it came into existence as a government, and exercised governmental powers. As the representative of the people,—their agent, delegated by the people of the United States,—the government adopted an administrative and legislative policy embracing both its direct relationship to foreign states, and the co-ordinate obligations of the citizens individually to uphold and effectuate that relationship. What the government might not do in its public capacity, without an infraction of the law of nations and subjecting itself to reprisals and war, it claimed the people should be prohibited doing individually, giving to its statute book the impress of that law, higher than the codes and rescripts of jurists, which inhib-

its doing to others, what others ought not to do to us. Charges of Chief Justice Jay and Mr. Justice Wilson to Grand Juries, in 1793 (Whart St. Tr. 55, 62). It is most manifest, that, at the earliest day the subject was acted on, the United States government intended to make the personal duties of citizens co-equal with those of the nation, in respect to acts of hostility against other states, and that the obligation was equally imperative whether those states were in peace or at war.

Mr. Jefferson in his letter to Mr. Genet, June 17, 1793, denies the right of the French government to enlist citizens of the United States within our territories into her service, upon the authority of writers on the Law of Nations; and in the end puts the objection to such acts of a foreign government, upon the broad ground, that we are at peace with all nations by the law of nature. "By that law man is at peace with man, till some aggression is committed, which by the same law, authorizes one to destroy another, as his enemy. For our citizens, then, to commit murders and depredations on the members of nations at peace with us, or to combine to do it, appeared, says the secretary of state, to the executive and to those whom they consulted, as much against the laws of the land, as to murder or rob, or to combine to murder or rob its own citizens, and as much to require punishment if done within their limits where they have territorial jurisdiction, or on the high seas, where they have a personal jurisdiction, reaching their own citizens only. So say our laws, as we understand them. To them the appeal is made, and whether we have construed them well or ill, the constitutional judges will decide." 1 Am. St. P. (Foreign Relations) 124, 155. It is manifest from this despatch that the cabinet then supposed that either the common law of the United States or the laws of the particular states made the acts reprobated crimes, when committed within their territories, and that individuals would thus be amenable to punishment for the robbery and murder of the subjects of a friendly nation out of our territory the same as if the offences had been committed within any particular state.

The supreme court of Pennsylvania in 1784, had declared the law of nations formed part of the municipal law of the state. Respublica v. Longchamps, 1 Dall. 111. And the chief justice of the United States, and two at least of his able associates, in 1793, expressed their opinions that the law of nations could be enforced by the federal courts, as the common law of the country, against persons indicted for its violation. Whart. St. Tr. 52, 55, 56, 62, 83. This doctrine is upheld by eminent lawyers of that day, writing since the events have passed. Rawle, Const. 10; Dup. Const. 3, note. But it is manifest the popular opinion was

against the doctrine. 4 Tuck. Bl. Append. 10. Appeals were accordingly made to the tribunals pursuant to the suggestion of Mr. Jefferson, both in respect to persons serving in armed vessels and with land forces against a friendly people, but it was found that the states either possessed no laws reaching the difficulty, or felt no disposition to enforce them (2 Marshall's Life of Washington, 233, 334), and that juries would not be governed by the law as laid down by the national judges in the federal courts (Whart. St. Tr. 83, 88).

In this state of the subject, the president in his speech at the opening of the next congress, called the attention of congress to his proclamation. and the regulations he had caused to be adopted, to enforce neutrality, and it is most plain, he contemplated and solicited the interposition of the legislature to compel the citizens to conform in all respects to the principles of the law of nations, recognized and observed on the part of the government, in regard to friendly powers. He says, "It rests with the wisdom of congress to correct, improve or enforce the plan of procedure (adopted by the administration), and it will probably be found expedient, to extend the legal code and the jurisdiction of the courts of the United States to many cases, which, though dependent on principles already recognized, demanded some further provisions. Where individuals shall, within the United States, array themselves in hostility against any of the powers at war, or enter upon military expeditions or enterprises within the jurisdiction of the United States, or usurp and exercise judicial authority within the United States; or where the penalties or violations of the law of nations may have been indistinctly marked, or are inadequate, these offences cannot receive too early and close an attention, and require prompt and decisive remedies." 1 Wait, St. Pap. 40; 1 Am. St. P. (Foreign Relations) 22. It is to be remarked, that out of three of the above four special calls for extending the criminal code, one only directly relates to a state of neutrality, the others looking to provisions for maintaining the sovereignty and peace of the United States in their relations with foreign powers, as well in peace as at war with each other.

The act of June 5, 1794, was passed the same session of congress, to which the above recommendation was addressed, and it deserves notice, as evidence of the scope and design of the enactment as understood by those active in producing its passage, that Mr. Jefferson, in 1806, as president, with the concurrence of Mr. Madison, secretary of state, caused prosecutions against Smith and Ogden and Col. Burr to be instituted, for setting on foot in the United States, warlike expeditions against provinces of Spain, and without any allusion to the offences imputed against them being violations

of our neutral obligations. 4 Jefferson's Writings, 86; Id. 103. At these periods Spain was nominally in alliance with France, but was secretly negotiating with England and Russia to come into the confederacy against Napoleon, and was therefore considered by them as quasi neutral. Ann. Reg. 1806, 1807; 4 Allison's Europe. And when the case of Smith and Ogden came before the United States court, Judge Patterson, without making any distinction in respect to belligerents, charged the grand jury that the principles of non-intervention embodied in the 5th section were founded upon the law of nations. Smith and Ogden's Trial, p. 219; also, p. 83. So it seems the policy and intent of this law has always been understood by the executive under every administration. An eminent statesman and jurist, speaking in the name of the government, declares its purpose was to prevent individuals being at war whilst their government is at peace. This exposition comports with the specific recommendations of President Washington. The United States, Mr. Webster remarks, have thought the salutary law of non-intervention by our nation with the ·affairs of others, is liable to be essentially impaired, if while the government refrains from interference, interference is still allowed to its subjects, individually or in masses.

The government of the United States has not considered it as sufficient to confine the duties of neutrality and non-interference to the case of governments whose territories lie adjacent to each other. The principle they regard the same, if those territories be divided by half the globe. The rule is founded on the impropriety and danger of allowing individuals to make war on their own authority, or, by mingling themselves in the belligerent operations of other nations, to run the hazard of counteracting the policy or embroiling the relations of their own government, and the United States have been the first among civilized nations to enforce that observance of this just rule of neutrality and peace by special and adequate legal enactments. By these laws it is prescribed to the citizens of the United States, what is understood to be their duty as neutrals by the law of nations, and their duty also which they owed to the interest and honor of their own country. Mr. Webster's letter to Mr. Fox, April 24, 1842; 1 Ex. Docs. (27th Cong., 3d Sept.) p. 127. The executive government since that period has adhered to the doctrine avowed in the above despatch, and denounced as a violation of the law of the land all acts contravening the terms of the 6th section of the act of 1818. That the law applies to and prohibits the setting on foot warlike expeditions in the United States to be carried on against any friendly power, was strongly maintained and declared during the administration of Mr. Van Buren.

The president in his proclamation of Nov. 21, 1838, declares that the combination or association of citizens of the United States to disturb the peace of the dominions of a friendly nation, is a violation of the laws providing for the performance of our obligations to the other powers of the world, and of that sacred code of laws by which national intercourse is regulated. 1 Ex. Docs. (3d Sept., 25th Cong.) p. 34. In his message to congress the president is distinct and explicit in asserting "that military invasions by our citizens into friendly countries and the commission of acts of violence on the members thereof, in order to effect a change in their government, or under any pretext whatever, have from the commencement of our government, been held equally criminal on the part of those engaged in them, and as much deserving of punishment as would be the disturbance of the public peace by the perpetration of similar acts within our own territory." These principles the president says were cherished and established by the great and good men who declared and established our independence, and were maintained at a highly critical period in our history, and subsequently embodied in highly penal enactments, the faithful enforcement of which he regards inseparably associated with the maintenance of our national honor. Id. pp. 5, 6. This language of the president was applied to the non-interference provisions of the statute, and not to those which may be strictly termed the neutrality clauses, and what he solicited from congress was a precautionary law to enable the executive to anticipate parties attempting the commission of the offences named in the 6th section and arrest them or their means before the acts should be actually consummated. So Attorney General Butler, in his opinion, upon the power of the president to seize, under the act of 1818, the arms of citizens setting on foot a military expedition against Canada, assumes that the 6th section applies to enterprises such as those then carried on against Canada. 2 Op. Attys. Gen. U. S. 1176. Neither the president or attorney general regard it an ingredient of the offence, that the state to be invaded, should be at war with another.

Looking at the provisions of the first section of the act of 1838, prepared as is understood with the sanction of the president, the secretary of state and attorney general, it seems to import a most explicit recognition that the acts done and means provided in the United States for carrying on warlike enterprises or expeditions into Canada, were in the then state of that province and the country, infractions of the 6th section of the act of 1818, and what was needful was something more than punishment by fine and imprisonment for the offences, when perpetrated, "provided," as the president says, "the parties can be found." It was a summary authority to intercept and break up the design

by seizing the means provided for carrying it on, and by arresting and holding to adequate bail persons suspected of being concerned in the enterprises. Act 1838, §§ 1, 6, 7.

This is all I deem necessary to be said in this connection in relation to the views of the executive department of the government, antecedent and subsequent to the passage of the law (and in this respect the acts of 1794 and 1818 may be regarded identical), showing that it was called for and always accepted and enforced as a law, no less of non-interference by our citizens by military expeditions against nations at peace with all the world, than one prohibiting acts of hostility in favor of any belligerent power against another in peace with the United States. This topic, however, being the one on which the defendants chiefly rely, they insisting the act of congress does not apply to the facts alleged against them, and the question being of great public moment to our own citizens and in our relations with foreign governments, it is meet the subject should be considered under other aspects. And I think the import of the law collected from its face, according to the established rules of interpretation plainly denotes the intention of congress to stamp as crimes acts done within our territories, designed to violate the peace and rights of a friendly people, whatever may be the relation of such people in respect to other nations. The cardinal consideration is, are they in amity with the United States, and if so, no persons shall be permitted within our jurisdiction, to take any warlike measures designed to disturb that peace.

We have already seen that the attention of congress was called to the subject of this law, because of unwarrantable usurpation of powers within the United States by the French minister. He openly claimed the right, and attempted to exercise it, to commission, arm, equip and man cruisers in our ports to commit hostilities on nations with whom the French were at war, and also to recruit land forces, issue commissions to officers, and organize within and march from our territories such forces against Florida and Louisiana, the dominions of Spain, or any other enemy of France. 2 Marshall's Life of Washington, 283, 287, 288, 334, 335. He publicly denied the power of this government to prevent his doing such acts, and a governor of a Western state, in which a warlike expedition was setting on foot against New Orleans, when required by the president to suppress it, coincided with the French minister, and denied there was any law of the United States prohibiting the enterprise. Id. 334, 335. This was in 1793. The measures taken by congress were designed to extend the criminal laws, and bring within them the very acts the government complained of and was endeavoring to suppress. It is nowhere said or intimated in the statute that this was done to maintain our neutrality in a technical sense. The act takes the title of an act "for the punishment of crimes against the United States," and only the 3d and 4th sections have express reference to acts in relation to other nations at war. The act under the same title was continued in force March 2, 1797, and made perpetual April 24, 1800. Nothing is more common than for the legislature to make provision in a public statute for matters beyond and distinct from the special causes which promoted its passage, and no principle of construction limits the operation of a statute to a particular mischief it remedies, when others of a kindred character are brought within its language.

It is the constant course of legislation, in removing a special evil or mischief, to make the enactments affecting it broad enough to suppress others, whether similar in character or wholly distinct from it in their nature. In such cases the statute is never interpreted to have relation only to the subject which more particularly called it into existence, but is made to operate in conformity to its language. Its true meaning is to be sought for in the body of the act itself. 1 Kent, Comm. 460, 463. Reading the act of 1794, with a view to these sensible and satisfactory rules of interpretation, it is difficult to see ground for doubt, that it does embrace and is carefully framed to include a class of offences distinct from those commonly understood to be infractions of the laws of neutrality. It devotes two sections specifically to those particular offences, and then furthermore declares to be high misdemeanors, for our citizens to enlist in foreign service or take commissions in it, or for any person within the territory or jurisdiction of the United States, to set on foot a military expedition, &c., &c., against any state, people, &c., with whom the United States are at peace. I see no mode of satisfying this language, but in holding it comprehends all the acts denounced, when committed within the United States, against a friendly power, without respect to his relationship to other powers. This, it appears to me, has been the acceptation in which the act has been received by our judges and most eminent jurists since its enactments.

The first instance in which the 5th section of the act of 1794 appears to have been acted upon judicially, was in the case of Bollman and Swartwout. The main point in the case related to other questions, but after the court had decided that the prisoners could not be held in the District of Columbia under imprisonment there for treason committed elsewhere, and that the facts in evidence did not prove the crime of treason, a question seems to have been made whether the prisoners were not liable to prosecution and to be detained under the 5th section of the act of 1794 for trial. The court say, "Admitting the affidavit of Genl. Wilkinson, both prisoners were guilty of a most culpable enterprise

against the dominions of a power at peace with the United States." They then rehearse the provisions of the 5th section, and remark that "there is a want of precision in the description of the offence which might produce some difficulty in deciding what cases came within it." U. S. v. Bollman, 4 Cranch [8 U. S.] 136, 137. The court thereupon discharged the prisoners, because the crime of treason for which they were arrested, was not proved against them and as they were not committed for setting on foot a military enterprise against the dominions of Spain, nor was it suggested that the offence had been committed within the District of Columbia, they ought not to be detained for that cause. The recognition of the act by the court as applicable to a warlike expedition from the United States against a friendly nation, without any reference to the proceeding having connection with a belligerent power, affords strong negative evidence, that the court did not regard the circumstance of such concurrence, to be an ingredient in the offence. But this implication is made to amount to almost conclusive evidence, by the proceedings the succeeding summer in the United States circuit court in Virginia against Col. Burr, already alluded to. He was not indicted, for any act of aid to one belligerent against another or otherwise violating the neutrality of the United States, but for setting on foot a military expedition in this country against the dominions of a nation at peace with the United States. On that occasion the point would directly arise and be cardinal for the defence of Col. Burr, if he was only indictable under the statute, for acts in aid of one belligerent against another. For supposing the fact that Spain, at the time, was at war with some other power with which the United States were at peace, a military expedition from the United States against the dominions of Spain in America, without concert or connection with any other belligerent, would not be regarded a violation of neutrality, on the part of the United States, but a direct act of invasion and war upon Spain. Vatt. Law Nat. 360. Each belligerent may indirectly in that manner aid the other against a common enemy; but, by making a common enemy and a common cause, the relationship of neutrality is abandoned and the attacking party becomes himself a belligerent. The defence was direct and patent, therefore, for Col. Burr, that the matters charged against him in the indictment were no violation of the statute, inasmuch as they were not, the assistance of one belligerent against its antagonist, so that if committed by the United States the acts would amount to a breach of their neutrality, if that fact any way affected the offence. It is not to be supposed a point so apparent and vital to the cause in one aspect, could have escaped the notice of the court and defence. Col. Burr was himself a member of the United States senate, and his counsel, Mr. Harper, a member of the house. when the act passed; his

counsel, Mr. Randolph, was secretary of state, and Mr. Lee, attorney general, the same year, and the presiding judge, shortly after, a member of congress and secretary of state. The presiding judge, the defendant and several of his counsel being thus lawyers and statesmen cotemporaries with the enactment of the law in question, and prominently active in the political agitations of the day, out of which the statute originated, had its purpose been solely to prevent a breach of our neutral relations with other countries, nothing could have been more familiar to the minds of those men than the fact that it was designed to have an operation so limited; and no evidence of a negative character can be more impressive and stringent, than the common assent on that trial, that the charges set forth made out a case of violation of the statute in its letter and intent. So, also, in the prosecution of Smith and Ogden, the indictment was for setting on foot a military expedition from the United States against Caraccas, Venezuela or Columbia, and other acts within the description on the 5th section of the statute only. That was also instituted under the presidency of Mr. Jefferson and the charges on which the accusation was grounded, were held by Attorney General Breckenridge to be an infraction of the act of 1794 for which the accused were subject to punishment. 1 Op. Attys. Gen. U. S. 98. Its design was to revolutionize that province, then being in a state of peace abroad, and with no domestic insurrection or disturbance. Enc. American Arts; Columbia, Miranda. Yet no exception was taken by the learned and zealous counsel who conducted the defence, and who brought to its support every topic which could tend to ward the prosecution from the defendants and fasten on the administration wrongful conduct and motives in instigating and directing it, nor was it suggested such a warlike expedition was no violation of the law, because it was no breach of neutral obligations. If not an innocent commercial expedition, as the defence maintained it to be, they took the other alternative, that it was direct and positive war, urged with the assent and concurrence of the government. In such posture of the defence, the prosecution stood defeated palpably upon the indictment, if the 5th section of the act of 1794 only interdicted those acts which were in violation of the neutrality of the country. The counsel and the court took no such limited view of the case. They understood the statute according to its plain reading, and the intimation was nowhere made in the whole range of the animated and not always entirely decorous discussions on the trial, that the statute did not embrace private acts of hostility begun to be carried on from the United States against a friendly power, in the largest sense of that language. Judge Patterson, in commenting on the provision of the act in question and its policy, says it is declaratory of the law of nations, and besides, every species of private and un-

authorized hostilities is inconsistent with the principles of the social compact and the very nature, scope and end of civil government. Trial of Smith and Ogden, 83; Whart. St. Tr. 55, 62 (Chief Justice Jay and Mr. Justice Wilson). The act of March 3, 1817 [3 Stat. 370], in its title and all the provisions, is strictly a neutrality act, and was occasioned by the insurrections and revolutions going on at the time in the South American and Mexican provinces. But so anomalous and extraordinary had been the character of hostilities and proceedings ·with some of those states and of citizens of the United States acting under assumed authority from them, that the attention of congress was called to the subject by a special message of President Monroe. 1 Am. St. P. (15th Cong., 1st Sess.) pp. 4, 5, Dec., 1817. The same session, the committee of foreign relations of the house of representatives reported a bill which, after long debates and repeated amendments, ultimately became the act of April 20, 1818. Journals, House Reps., 15th Cong., 1st Sess. That law purports in its title, to be a crimes act, and not one to preserve the neutral relations of the United States. It embodies the acts of 1794 and 1817, with alterations and additions. It is not now material to collate the three statutes, but it is observable that the last marks with more precision and exactness than the preceding ones the cases of violations of neutral obligations provided against. It also creates offences not named in the acts of 1794 and 1817, and which in no sense can be arranged under neutral obligations. For instance the 4th section, in relation to citizens of the United States being concerned, out of the United States, in privateers cruizing against the property of citizens of the United States. And it is doubtful, upon tne terms of the statute, whether enlisting, within the United States, in the service of any foreign power, or going out of the United States with intent to enlist, is not made an offence, without regard to the employment of such soldier or sailor in the foreign service. The sections of the act which in terms indicate a reference to neutral duties, are the first, fourth and fifth; the 2d, 6th and 8th have no such connection in language, and must take effect independently of that consideration, unless upon the principles of reasonable construction, they are found limited to that application. The act has been otherwise always understood by our public functionaries executive and judicial.

President Van Buren, in his message to congress of Dec. 3, 1838, before cited, in reference to the hostile movements on foot in this country against Canada, says, "It is by the laws already made criminal in our citizens by unauthorized military operations on their part, to embarrass or anticipate the decision of congress, whether the country shall interfere with or be made a party to the struggle in those provinces." In his message of January 5, 1838 (which led to the act of 1838), the president further says, "The existing laws are insufficient to guard against hostile invasions, from the United States, of the territory of friendly and neighboring nations. The laws now in force provide sufficient penalties for the punishment of such offences after they have been committed, and provided the parties can be found; but the executive is powerless in many cases to prevent the commission of them, even when in possession of ample evidence of an intention, on the part 'of evil disposed persons, to violate our laws." 2 Executive Documents (25th Cong., 2d Sess.) Document 64. And the act of March 10, 1838 [5 Stat. 212], passed in compliance with the instance of the president, to aid the execution of the 6th section of the act of 1818, most manifestly indicates the understanding of congress that the offences denounced came within the meaning of that statute, and the latter one was required in the peculiar situation of the two countries to enable the president to enforce the former according to its spirit and intent.

Mr. Webster in his correspondence with the British minister, Mr. Fox, on this subject, before cited, also represents the act of 1818 as covering the very case of an invasion of Canada, from the United States, in a time of peace, within and without the provinces. 1 Ex. Docs. (27th Cong., 3d Sess.) p. 127. So, also, President Taylor in his proclamation, August 11, 1849, expressly pronounces the alleged enterprises on foot in the United States against Cuba, to be a violation of the criminal laws of the United States. 3 Ex. Docs. (1st Sess., 31st Cong.) pt. 1. The same declaration is repeated, by authority of President Fillmore, by Mr. Webster, in public instructions to the U. S. attorneys. Circular, Sept. 3, 1850. So far as the act has come within the cognizance of the United States judges, they have invariably recognized the 6th section as applicable to and designed to punish such state of facts. In 1835, the grand jury of this district submitted to the circuit judges the enquiry whether it was a violation of that section, for persons to hold meetings in this city and appoint committees to provide means and make collections for the purpose of enabling the inhabitants of Texas to engage in a civil war with Mexico, now at peace with the United States. The judges, Thompson and Betts, answered in writing, that the section applied to military expeditions to be carried on from the United States, and that the case supposed did not fall within it. But the answer necessarily imports the opinion of the judges that such military expedition would be a violation of the law. 3 Ex. Docs. (25th Cong., 2d Sess.). Judge Rawle, of the local court, New Orleans, in effect ruled the same point. Id. p. 22. Judge Conkling, in a letter to Mr. Fillmore in congress, on this subject, puts the same construction upon the 6th section of

the act. He notes a defect in the statute in not providing sufficient precautionary means to enable the government to arrest persons entering upon such enterprises before the crime is consummated. 3 Ex. Docs. (3d Sess., 25th Cong.) Doc. 35.

Judge McLean, in a matured charge delivered the grand jury, in relation to the hostile movements from our territories upon Canada, in 1838, declares the 6th section of the act has application to military expeditions of that character, against a people at peace with us and within itself. [See Charge to the Grand Jury] 2 McLean, 1. It may be added that this court, in 1850, gave similar instructions to the grand jury in this district, in respect to military expeditions against Cuba, and repeated the same sentiment to the grand jury who found the indictment now under consideration. In the circuit court at New Orleans, Judge McCaleb recently instructed the grand jury that the act applies to the case of setting on foot or providing means for a military expedition against Cuba, from the United States; and in his charge to the petit jury on the trial of the indictment and after prolonged discussions upon the subject, he adheres to that interpretation of the law. Pamph. Rep. pp. 4, 7, 29.

After this review of the subject in its various bearings, I am prepared to say, that upon the plain language of the statute, —from the circumstances which induced its passage, the double obligation of the government to keep individual citizens aloof from the conflicts of foreign powers, and to prevent their making private war upon nations at amity with us,—from the concurrent views of executive and judicial officers as to the meaning and design of the statute, that the case made by this indictment comes within the purpose and meaning of the sixth section of the act of 1818 and is a manifest violation of its provisions. The motion to quash the indictment cannot, therefore, on these views of the subject, prevail. But I would remark that, notwithstanding my own conviction, resulting from a careful survey of the questions debated on this motion, that the acts of the defendants charged in the indictment, constitute an infraction of the sixth section of the act of 1818, and are sufficiently laid in the indictment; yet, in deference to the opinion of the distinguished counsel of the defendants, so earnestly expressed and so ably supported, I shall submit this decision to the consideration of the judge of the circuit court; and if he suggests a doubt of the justness of the conclusions adopted in it, or shall intimate that he does not concur in them, I will then remit the case to the circuit court, that the defendants may, by means of a difference of opinion of the two judges, have the points certified to the supreme court for final decision.

[See Cases Nos. 15,973 and 15,975.]