# Application of the Neutrality Act to Official Government Activities

Section 5 of the Neutrality Act, 18 U.S.C. § 960, forbids preparation for, or participation in, military expeditions against a foreign state with which the United States is at peace. This provision is intended solely to prohibit persons acting in a private capacity from taking actions that might interfere with the foreign policy and relations of the United States. It does not proscribe activities conducted by Government officials acting within the course and scope of their duties as officers of the United States.

April 25, 1984

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

This memorandum is written in connection with recent allegations[1] that several United States Government officials may have violated § 5 of the Neutrality Act, 18 U.S.C. § 960, which forbids the planning of, provision for, or participation in "any military or naval expedition or enterprise to be carried on from [the United States] against the territory or dominion of any foreign prince or state . . . with whom the United States is at peace." To assist you in the discharge of your responsibility under Title VI of the Ethics in Government Act, 28 U.S.C. §§ 591–598, to determine preliminarily whether such charges, if true, might constitute a crime, we have undertaken a thorough examination of the Neutrality Act (Act), with particular attention toward § 5, its legislative history, the historical circumstances surrounding its enactment, existing judicial precedent regarding the Act, and the history of Executive and Legislative relations with respect to the Act's application. Based upon these considerations, we have concluded that the Act does not proscribe activities conducted by Government officials acting within the course and scope of their duties as officers of the United States but, rather, was intended solely to prohibit actions by individuals acting in a private capacity that might interfere with the foreign policy and relations of the United States.

---

[1] The most recent assertions in this regard that have been brought to our attention are those made in a letter to you, dated April 9, 1984, from a majority of the Democratic Party members of the Committee on the Judiciary of the House of Representatives, taking the position that several Government officials may have violated the Act by participating in a plan "to covertly aid, fund and participate in a military expedition and enterprise utilizing Nicaraguan exiles for the purpose of attacking and overthrowing the government of Nicaragua, a country with which the United States is officially at peace."

# I. Evolution of the Neutrality Act

## A. *President Washington's Proclamation of 1793*

The Neutrality Act was enacted in 1794 following President Washington's Proclamation of April 22, 1793, regarding the war between France and Great Britain, requiring the citizens of the United States "with sincerity and good faith [to] adopt and pursue a conduct friendly and impartial toward the belligerent powers," warning citizens "to avoid all acts and proceedings whatsoever, which may in any manner tend to contravene such disposition," and threatening to prosecute those "who shall, within the cognizance of the courts of the United States, violate the law of nations with respect to the powers at war, or any of them."[2] The President viewed the Proclamation as a necessary measure toward restraining the natural sympathy and enthusiastic support of the American people for the French cause, born of France's generous aid to the colonists during the American Revolution and the Americans' strong identification with the goals of the French Revolution. *See generally* C. Fenwick, *The Neutrality Laws of the United States* 16–23 (1913) (Fenwick).[3] Writing nearly one-

---

[2] The Proclamation provided:

> Whereas it appears that a state of war exists between Austria, Prussia, Sardinia, Great Britain, and the United Netherlands, on the one part, and France on the other; and the duty and interest of the United States require, that they should with sincerity and good faith adopt and pursue a conduct friendly and impartial towards the belligerent powers:
>
> I have therefore thought fit by these presents, to declare the disposition of the United States to observe the conduct aforesaid towards those powers respectively; and to exhort and warn the citizens of the United States carefully to avoid all acts and proceedings whatsoever, which may in any manner tend to contravene such disposition.
>
> And I do hereby also make known, that whosoever of the citizens of the United States shall render himself liable to punishment or forfeiture under the law of nations, by committing, aiding, or abetting hostilities against any of the said powers, or by carrying to any of them, those articles which are deemed contraband by the modern usage of nations, will not receive the protection of the United States, against such punishment or forfeiture; and further, that I have given instructions to those officers, to whom it belongs, to cause prosecutions to be instituted against all persons, who shall, within the cognizance of the Courts of the United States, violate the law of nations, with respect to the powers at war, or any of them.

32 *Writings of George Washington* 430 (J. Fitzpatrick ed 1939). *See also* 1 *Messages and Papers of the Presidents* 156 (J. Richardson ed. 1896).

[3] President Washington wrote to Secretary of State Jefferson on April 12, 1793:

> Your letter of the 7 instant was brought to me by the last post. War having actually commenced between France and Great Britain, it behoves the Government of this Country to use every means in its power to prevent the citizens thereof from embroiling us with either of those powers, by endeavouring to maintain a strict neutrality. I therefore require that you will give the subject mature consideration, that such measures as shall be deemed most likely to effect this desirable purpose may be adopted without delay; for I have understood that vessels are already designated privateers, and are preparing accordingly.
>
> Such other measures as may be necessary for us to pursue against events which it may not be in our power to avoid or controul, you will also think of, and lay them before me at my arrival in Philadelphia, for which place I shall set out Tomorrow....

On the same date, Washington wrote to Secretary of the Treasury Hamilton:

> Hostilities having commenced between France and England, it is incumbent on the Government of the United States to prevent, as far as in it lies, all interferences of our Citizens in them;

Continued

59

hundred years later, a committee of Congress described the historical circumstances immediately preceding President Washington's Proclamation and the passage of the Act as follows:

> The enthusiasm of republicans for France, and their hostility to England, was not much less marked in America than in France. It brought public opinion to the verge of revolt against the peaceful policy of Washington. Accountable to the people for its resistance to popular clamor and the consequences of its timid submission to the demands of England, whose arrogant pretensions intensified the popular friendship for France, the administration was threatened with formidable resistance, if not the overthrow of its policy.

H.R. Rep. No. 100, 39th Cong., 1st Sess. 2 (1866).

In addition, the United States and France had entered into two "treaties" in 1778, both of which threatened the new nation's posture of neutrality regarding the military affairs of the European countries.[4] The more serious threat was posed by the Treaty of Amity and Commerce, 8 Stat. 12,[5] which made it lawful for French ships and privateers to enter United States ports with their prizes of war and unlawful for ships of other foreign nations carrying subjects or property of France as their prizes of war to enter American ports. *See generally* Fenwick, *supra*, at 16–32.

In the spring of 1793, Edmund Charles Genet, French Minister to the United States, arrived in this country and, pursuant to the Treaty of Amity and Commerce, began issuing commissions to commanders of vessels willing to serve France and authorizing the outfitting of privateers from American ports. Secretary of State Jefferson protested to the French Minister that such conduct was not "warranted by the usage of nations, nor by the stipulations existing between the United States and France," but met with continued resistance from Genet that "no article of [the Treaties] impose[d] . . . the painful injunction of abandoning us in the midst of the dangers which surround us." Fenwick, *supra*, at 18–19. Finally, Jefferson informed Genet that "after mature consideration," President Washington had concluded:

---

[3] (. . . continued)
and immediate precautionary measures ought, I conceive, to be taken for that purpose, as I have reason to believe (from some things I have heard) that many Vessels in different parts of the Union are designated for Privateers and are preparing accordingly. The means to prevent it, and for the United States to maintain a strict neutrality between the powers at war, I wish to have seriously thought of, that I may as soon as I arrive at the Seat of the Government, take such steps, tending to these ends, as shall be deemed proper and effectual. With great esteem etc.

32 *Writings of George Washington, supra*, at 415, 416.

[4] These "treaties" were entered into by the colonists during the American Revolution in exchange for aid from France, *see* 8 Stat. 6, 12, and were not annulled by Acts of Congress until 1798.

[5] The other treaty was the Treaty of Alliance, 8 Stat. 6, regarding which there existed a serious question within Washington's Cabinet as to whether the United States was obligated to take up arms in France's defense. However, because France apparently never forced a resolution of the issue, it remained unresolved. *See* Lobel, *The Rise and Decline of the Neutrality Act: Sovereignty and Congressional War Powers in United States Foreign Policy*, 24 Harv. Int'l L.J. 1, 12–13 (1983).

[T]hat the arming and equipping [of] vessels in the ports of the United States, to cruise against nations with whom we are at peace, was incompatible with the territorial sovereignty of the United States; that it made them instrumental to the annoyance of those nations, and thereby tended to compromit their peace; and that he thought it necessary, as an evidence of good faith to them, as well as a proper reparation to the sovereignty of the country, that the armed vessels of this description should depart from the ports of the United States.

*　　　*　　　*

After fully weighing again, however, all the principles and circumstances of the case, the result appears still to be, that it is the *right* of every nation to prohibit acts of sovereignty from being exercised by any other within its limits, and the *duty* of a neutral nation to prohibit such as would injure one of the warring Powers; that the granting [of] military commissions, within the United States, *by any other authority than their own,* is an infringement on their sovereignty, *and particularly so when granted to their own citizens, to lead them to commit acts contrary to the duties they owe their own country*[.]

Fenwick, *supra,* at 19 (quoting 1 *American State Papers, Foreign Relations* 149 (emphasis added)).[6]

Notwithstanding the President's Proclamation and the continued public reprimands of Minister Genet, privateers continued to be outfitted in American ports for the service of France,[7] with the individuals involved suffering few legal reprisals by the United States Government. Although there were several prosecutions of individual citizens charged with attacking the property and citizens of nations at peace with the United States, the prosecutions were unsuccessful, largely because there were no federal statutes defining such acts as crimes and legal opinion was divided on the question whether violations of international law could provide a basis for a common law federal offense. The

---

[6] In reporting this incident, Fenwick states that in this passage, "Jefferson set forth in clear and simple terms the principles of neutrality as understood by the President." Fenwick, *supra,* at 19.

[7] However, the instructions — "deductions from the laws of neutrality, established and received among nations" — issued by Secretary Hamilton on August 7, 1793 to customs collectors in major ports appears to have had some effect in decreasing the incidence of privateering. Fenwick describes the instructions as follows:

> The instructions called upon the collectors to be vigilant in detecting any acts in violation of the laws of neutrality, and to give immediate notice of such attempts to the proper authorities No asylum was to be given to vessels, nor to their prizes, of either of the powers at war with France, in accordance with the Treaty of 1778 with France, nor to armed vessels which had been originally fitted out in any port of the United States by either of the parties at war. The purchase of contraband articles, as merchandise, was to be free to both parties. The names of citizens of the United States in the service of either of the parties were to be notified to the local state governor Vessels contravening these regulations were to be refused clearance. Vessels, except those in the immediate service of foreign governments, were to be examined as to their military equipment upon entering and upon leaving port.

Fenwick, *supra,* at 22–23.

most celebrated of these cases is *Henfield's Case,* 11 F. Cas. 1099 (C.C.D. Pa. 1793) (No. 6360), in which Henfield was prosecuted at common law for enlisting on the French privateer, "Citizen Genet," in violation of the treaties of the United States and the law of nations. Although, upon the urging of Attorney General Randolph, the court recognized such actions as violations of the sovereignty of the United States in its charge to the jury, Henfield nevertheless was acquitted. *See generally* Lobel, *The Rise and Decline of the Neutrality Act, supra,* at 13–14; Fenwick, *supra,* at 24. Regarding this case, Jefferson wrote in a letter to James Monroe:

> The Atty General gave an official opinion that the act was against law, & coincided with all our private opinions; & the lawyers of this State, New York & Maryland, who were applied to, were unanimously of the same opinion. Lately mr. Rawle, Atty of the U.S. in this district, on a conference with the District judge, Peters, supposes the law more doubtful. New acts, therefore, of the same kind, are left unprosecuted till the question is determined by the proper court, which will be during the present week. . . . I confess I think myself that the case is punishable, & that, if found otherwise, *Congress ought to make it so,* or we shall be made parties in every maritime war in which the piratical spirit of the banditti in our ports can engage.

6 *Writings of Thomas Jefferson* 347–48 (P. Ford ed. 1895) (emphasis added).

In addition, in the summer of 1793, United States officials became aware of Minister Genet's efforts to organize armies to invade New Orleans and the Floridas, then in the possession of Spain, an ally of Great Britain. As a result of these and other similar events, and the apparent ineffectiveness of existing legal mechanisms to restrain such activities, President Washington sought to enact into legislation the principles of neutrality set forth in his Proclamation.

## B. The Neutrality Act of 1794

In his annual address to Congress in December 1793, President Washington articulated his views regarding the role of the principle of neutrality in sovereign states and called upon Congress to implement such principles through legislation. President Washington proclaimed:

> In this posture of affairs, both new and delicate, I resolved to adopt general rules, which should conform to the treaties and assert the privileges of the United States. These were reduced into a system, which will be communicated to you.

> \*     \*     \*

> It rests with the wisdom of Congress to correct, improve, or enforce this plan of procedure; and it will probably be found expedient to extend the legal code and the jurisdiction of the

Courts of the United States to many cases which, though dependent on principles already recognised, demand some further provisions.

Where individuals shall, within the United States, array themselves in hostility against any of the Powers at war[;] or enter upon military expeditions or enterprises within the jurisdiction of the United States; or usurp and exercise Judicial authority within the United States; or where the penalties on violations of the law of nations may have been indistinctly marked, or are inadequate — these offences cannot receive too early and close an attention, and require prompt and decisive remedies.

4 *Annals of Congress* 11 (1793).

The Neutrality Act was enacted on June 5, 1794. 1 Stat. 381. Although originally enacted as a temporary measure,[8] the Act was continued in force by the Act of Mar. 2, 1797, 1 Stat. 497, and finally made permanent by the Act of Apr. 24, 1800, 2 Stat. 54. Through several amendments[9] and the re-enactment of its provisions in the revision and codification of Title 18 in 1909, 35 Stat. 1088, 1089, and again in 1948, 62 Stat. 683, 744, the Act today remains substantially similar to that which was first enacted in 1794.

Section 1 of the Act, 18 U.S.C. § 958, provides:

Any citizen of the United States who, within the jurisdiction thereof, accepts and exercises a commission to serve a foreign prince, state, colony, district, or people, in war, against any prince, state, colony, district, or people, with whom the United States is at peace, shall be fined not more than $2,000 or imprisoned not more than three years, or both.

Section 2, 18 U.S.C. § 959, provides in pertinent part:[10]

(a) Whoever, within the United States, enlists or enters himself, or hires or retains another to enlist or enter himself, or to go beyond the jurisdiction of the United States with intent to be enlisted or entered in the service of any foreign prince, state, colony, district, or people as a soldier or as a marine or seaman on board any vessel of war, letter of marque, or privateer, shall

---

[8] That the Act's operation was originally limited to a term of two years testifies to "the character of the act, and the extent to which it came in conflict with the opinions of the people, as well as the extraordinary influences under which it was enacted." H.R. Rep. No. 100, *supra*, at 2.

[9] *See, e.g.*, Act of Mar. 3, 1817, 3 Stat. 370; Act of Apr. 20, 1818, 3 Stat. 447, Act of Mar. 10, 1838, 5 Stat. 212. Parts of the Act were also amended in 1917, in the "Act to punish acts of interference with the foreign relations, the neutrality, and the foreign commerce of the United States, to punish espionage, and better to enforce the criminal laws of the United States," commonly referred to as the "Espionage Act," 40 Stat. 217.

[10] Subsection (b) of § 2 generally exempts from subsection (a)'s coverage "citizens or subjects of any country engaged in war with a country with which the United States is at war;" subsection (c) generally exempts from the Act's coverage citizens of the foreign nations who are "transiently within the United States . . . [who] enlist on board any vessel of war . . . which at the time of its arrival within the United States was fitted and equipped as such."

be fined not more than $1,000 or imprisoned not more than three years, or both.

Section 3, 18 U.S.C. § 962, provides in pertinent part:

> Whoever, within the United States, furnishes, fits out, arms, or attempts to furnish, fit out or arm, any vessel, with intent that such vessel shall be employed in the service of any foreign prince, or state, or of any colony, district, or people, to cruise, or commit hostilities against the subjects, citizens, or property of any foreign prince or state, or of any colony, district, or people with whom the United States is at peace; or

> Whoever issues or delivers a commission within the United States for any vessel, to the intent that she may be so employed —

> Shall be fined not more than $10,000 or imprisoned not more than three years, or both.

Section 4, 18 U.S.C. § 961, provides in pertinent part:

> Whoever, within the United States, increases or augments the force of any ship of war . . . which, at the time of her arrival within the United States, was a ship of war . . . in the service of any foreign prince or state, or of any colony, district, or people, or belonging to the subjects or citizens of any such prince or state, colony, district, or people, the same being at war with any foreign prince or state, or of any colony, district, or people, with whom the United States is at peace, by adding to the number of the guns of such vessel . . . or by adding thereto any equipment solely applicable to war, shall be fined not more than $1,000 or imprisoned not more than one year, or both.

Section 5, 18 U.S.C. § 960 provides:

> Whoever, within the United States, knowingly begins or sets on foot or provides or prepares a means for or furnishes the money for, or takes part in, any military or naval expedition or enterprise to be carried on from thence against the territory or dominion of any foreign prince or state, or of any colony, district, or people with whom the United States is at peace, shall be fined not more than $3,000 or imprisoned not more than three years, or both.

Although the debates in Congress regarding these provisions focused largely on the immediate problems posed by the 1778 "treaties" with France and how they would be affected by the anti-privateering and confiscation of goods provisions of the Act,[11] the Act's legislative history nevertheless reveals other

---

[11] Section 3 of the Act provided for the confiscation of goods on armed vessels, outfitted within the United States, that committed hostile acts against territories with which the United States was at peace.

key issues that were addressed by the Act's passage. Several commentators have suggested, and the speeches of President Washington, Secretary Jefferson, and various Senators and Representatives support the view, that the United States, in the early stages of its development as a republic, embraced the general principle of neutrality as a means, in view of its military weakness and geographic isolation, of advancing its commercial interests by avoiding involvement in European wars and protecting its independence and sovereignty from violation by foreign states, as well as of consolidating its federal powers and strengthening the sovereignty of the federal government over its individual citizens. *See generally* Fenwick, *supra;* Lobel, *The Rise and Decline of the Neutrality Act, supra,* and sources cited therein. *See also United States* v. *O'Sullivan,* 27 F. Cas. 367, 373–75 (S.D.N.Y. 1851) (No. 15974) (providing an account of the Act's passage).

In 1866, the House Committee on Foreign Affairs, which was engaged in an extensive review of the Act's history, described the state of the new nation after 1783 and the historical circumstances that compelled the Act's passage:

> The independence of the American colonies was acknowledged by Great Britain in 1783. The participation of the colonies in the Indian and French wars, and the severe and long-continued struggle of the Revolution made it necessary that the new government under the Constitution should husband its resources, and, if possible, avoid all complications with foreign nations. The foreign policy of the administration of Washington — as wise and necessary as it was successful — was based upon this idea. It is now conceded that the safety of the republic imperiously demanded this policy.

H.R. Rep. No. 100, *supra,* at 1. In his Farewell Address to the Nation on September 19, 1796, President Washington reiterated these themes:

> The Great rule of conduct for us, in regard to foreign Nations is in extending our commercial relations to have with them as little political connection as possible. So far as we have already formed engagements let them be fulfilled, with perfect good faith. Here let us stop.

> Europe has a set of primary interests, which to us have none, or a very remote relation. Hence she must be engaged in frequent controversies, the causes of which are essentially foreign to our concerns. Hence therefore it must be unwise in us to implicate ourselves, by artificial ties, in the ordinary vicissitudes of her politics, or the ordinary combinations and collisions of her friendships, or enmities;

> Our detached and distant situation invites and enables us to pursue a different course. If we remain one People, under an

65

efficient government, the period is not far off, when we may defy material injury from external annoyance; when we may take such an attitude as will cause the neutrality we may at any time resolve upon to be scrupulously respected; when belligerent nations, under the impossibility of making acquisitions upon us, will not lightly hazard giving us provocation; when we may choose peace or war, as our interest guided by our justice shall Counsel.

35 *Writings of George Washington, supra,* at 233–34.

Critical to the effort to remain detached from foreign entanglements was establishing to foreign powers and to the citizens of the United States that *only the Government* was authorized to articulate United States foreign policy. Unauthorized acts by private individuals in this regard were not to be recognized by foreign nations, and, indeed, were to be punished by the United States, "because no citizen should be free to commit his country to war." 6 *Writings of Thomas Jefferson, supra,* at 347. In reviewing the history and purposes of the Act, the United States District Court for the Southern District of New York, in a landmark decision in 1851, analogized the neutrality obligations that the drafters sought to impose on individuals through the enactment of civil penal laws to those imposed by the law of nations on sovereign governments:

> As the representative of the people, — their agent, delegated by the people of the United States, — the government adopted an administrative and legislative policy embracing both its direct relationship to foreign states, and the coordinate obligations of the citizens individually to uphold and effectuate that relationship. What the government might not do in its public capacity, without an infraction of the law of nations and subjecting itself to reprisals and war, it claimed the people should be prohibited doing individually . . . . It is most manifest, that, at the earliest day the subject was acted on, *the United States government intended to make the personal duties of citizens co-equal with those of the nation,* in respect to acts of hostility against other states . . . *[and] to compel the citizens to conform in all respects to the principles of the law of nations,* recognized and observed on the part of the government, in regard to friendly powers.

*United States* v. *O'Sullivan,* 27 F. Cas. at 374, 375 (emphasis added). *See also* Fenwick, *supra,* at 1–14.

During the debate on the Neutrality Act, Representative Ames spoke of the weakness of the United States' general authority and of the threat of "be[ing] driven into a war by the licentious behavior of some individuals." 4 *Annals of Congress* 743 (1794). Representative Wadsworth expressed a similar view:

> If the Executive cannot hinder these people from going to sea in this way, we must be forced into hostilities immediately. We send an Ambassador to England to secure peace; and we follow

up this application by sending out privateers. Will any nation, in such a case, believe that our desire of peace is sincere? Is the seizing of their ships a sign of it?

*Id.* at 744. Representative Murray reiterated the importance of securing *governmental* control over the power of individuals to affect foreign policy:

[W]ere people only meeting to form the very first elements of a civil compact, they would have a right to say to each member of their society, that he should not enlist in any foreign service, to invade a nation perhaps friendly to them, *without their consent.* To countenance recruiting for foreign service, was admitting into the heart of the country an engagement against the sovereignty of the country.

*Id.* at 746 (emphasis added). This view was reiterated again by the court in the *O'Sullivan* case as an underlying purpose of the Act:

[T]his government . . . possesses the unquestionable power to prohibit . . . citizens, individually, or in association with others, from entering into engagements or measures within the American territory, or upon American vessels, in hostility to other nations, and which may compromit [sic] our peace with them. *It would be most deplorable if no such controlling power existed in this government, and if men might be allowed, under the influence of evil, or even good, motives, to set on foot warlike enterprises from our shores, against nations at peace with us, and thus, for private objects,* sordid or criminal in themselves — or under the impulse of fanaticism or wild delusions — *bring upon this country, at their own discretion, the calamities of war.* The will of the nation is expressed in this respect, by the statute of [1794].

*United States* v. *O'Sullivan,* 27 F. Cas. at 383 (emphasis added). Thus, the Neutrality Act, by outlawing private warfare, would ensure that the nation's foreign policy was made by the President, with appropriate participation by Congress, working through the political process in fulfillment of their constitutional roles, and not by the unilateral and unrestricted acts of private individuals.[12]

---

[12] In arguing that the Act was intended to proscribe actions by the Government as well as those of individuals acting in their private capacities, some commentators have pointed to the English predecessor to § 2 of the Act, which excepted from the English act's prohibitions those enlistments that were authorized by the Queen, and the failure of the United States Congress to make explicit similar exceptions in its Act. *See, e.g.,* Lobel, *The Rise and Decline of the Neutrality Act, supra,* at 31–33. However, it was clear to early scholars that the drafters' use of the term "any person" in § 2 was not intended to bar enlistments duly authorized by the Government.

Sections 1 and 2 of the Act were designed to protect the nation's sovereignty over its territory and its independence in world affairs by prohibiting belligerents from recruiting troops within its borders "without the consent of the sovereign," 7 Op. Att'y Gen. 367, 368, 381 (1855), and by prohibiting its citizens from engaging in private acts of warfare, *i.e.,* accepting and exercising commissions in the service of nations against nations with which the United States was at peace, which could be interpreted erroneously by foreign

Continued

67

In calling for amendments to the Act in 1803 to strengthen its provisions to respond more effectively to the involvement of American citizens in the South American colonial wars,[13] President Jefferson re-emphasized the Act's purpose to prevent *individual citizens* from embarking on private expeditions in contravention of the Government's foreign policy goals:

> [L]et it be our endeavor, as it is our interest and desire, to cultivate the friendship of the belligerent nations by every act of justice and of innocent kindness; to receive their armed vessels with hospitality from the distresses of the sea, but to administer the means of annoyance to none; . . . *to restrain our citizens from embarking individually in a war in which their country takes no part;* to punish severely those persons, citizen or alien, who shall usurp the cover of our flag for vessels not entitled to it, *infecting thereby with suspicion those of real Americans and committing us into controversies for the redress of wrongs not our own*[.]

---

[12] ( . . . continued)
powers as acts of the United States Government. *See generally* Warren, Assistant Attorney General, "Memorandum of Law on the Construction of Section 10 of the Federal Code [currently 18 U.S.C. § 959]" (1915). In his memorandum, Assistant Attorney General Warren traced the development of § 959's predecessors from their origins in the British Act of 13 Anne, ch. 10 (1713), which prohibited the "listing of Her Majesties subjects to serve as soldiers without Her Majesties license," to 1915. In discussing the evolution of this prohibition in the United States, Warren noted that although the American Congress had extended the Act beyond the prohibitions contained in the English act to prohibit *"any person"* within the United States from enlisting in foreign service, and thus made "unlawful the recruiting or enlisting of all foreign citizens within this country," Congress implicitly retained the Act's prohibition against acts to which the Government had not consented. *Id.* at 3–11. *See also* 4 *Annals of Congress* 746 (1794); 7 Op. Att'y Gen. at 381 ("The main consideration is the sovereign right of the United States to exercise complete and exclusive jurisdiction within their own territory; to remain strictly neutral, if they please, in the face of the warring nations of Europe . . . . All which it concerns a foreign government to know is whether we, *as a government,* permit such enlistments.") (emphasis added)

[13] The following account of the impact on the American public of the revolutions by Spanish colonists in the Western Hemisphere during the first two decades of the 19th century provides valuable insight into the tensions between the collective individual wills of the American people and the federal government as a sovereign entity, and the necessity for vigorous enforcement of United States foreign policy of neutrality against those individuals who would violate it.

> The independence of the Spanish republics was hailed by the people of this country as the most auspicious event of the age. No government in Europe except that of Spain had resisted the freedom of the Spanish provinces by force. But all the nations of Europe in alliance with Spain maintained her right to the government of the colonies. Great Britain had been invited by Spain, in conjunction with the European alliance, to mediate between her and the colonies, upon the basis of their continued submission to her authority, with certain ameliorations as to commerce and the appointment of officers. The United States, whose co- operation was solicited by Great Britain, declined to enter into any plan of pacification, except upon the basis of their independence. The recognition of their independence was deferred for several years in deference to the authority of the Holy Alliance. Spain declared that such recognition would be regarded by her as an act of hostility. Their independence was recognized in 1822, after a contest of twelve years. The sympathy of the American people for the Spanish patriots was sincere and universal, and their hostility to the government and institutions of Spain was equally strong. The proximity of the Spanish provinces to our own country, and their inability on account of their want of vessels-of-war, to cope with Spain upon the sea, rendered it difficult to prevent our citizens from giving them aid in their struggle for liberty. It was still more difficult to allay the suspicions of the European governments of our complication with the revolutionists.

H.R. Rep. No. 100, *supra,* at 3.

68

1 *Messages and Papers of the Presidents, supra,* at 361 (emphasis added). In reviewing the amendments proposed, and the proclamations issued, by Presidents Jefferson and Madison during the colonial rebellions against Spain, the House Committee on Foreign Affairs in 1866 reported:

> It is impossible to suppose that provisions so repressive upon American commerce, so hostile to the cause of liberty in the colonies, and so strongly in favor of a government whose principles were so repugnant to the people as those of Spain, were voluntarily adopted. They had their origin in the interests of European governments hostile to the cause of the colonies. But it was not this consideration alone that led to their permanent enactment. The established policy of the government was that of peace with all nations. To maintain this policy it waived, both at home and abroad, interests to which, under other circumstances, it would have resolutely adhered. The declarations of Washington upon this subject are too familiar to require repetition. *They were accepted by all his successors.*

H.R. Rep. No. 100, *supra,* at 4 (emphasis added). *See generally* Fenwick, *supra,* at 31–41.

This theme has been sounded again and again by Presidents throughout the history of our Nation. President Van Buren, in 1838, admonished American citizens against arming themselves in support of the Canadian revolt against Great Britain, and warned that "any persons who shall compromit [sic] the neutrality of this Government by interfering in an unlawful manner with the affairs of the neighboring British Provinces will render themselves liable to arrest and punishment under the laws of the United States, which will be rigidly enforced." 3 *Messages and Papers of the President, supra,* at 481.

Likewise, Presidents Tyler and Fillmore issued proclamations in 1849 and 1851, respectively, warning against hostile expeditions into Cuba and Mexico; in 1854 and again in 1858 Presidents Pierce and Buchanan warned against individual involvement in support of belligerent factions in Nicaragua; in 1870 President Grant warned against American participation in the Cuban revolution against Spain; and in 1912 President Taft issued a proclamation warning Americans against assisting Mexican insurgents. *See generally* Fenwick, *supra,* at 41–48.

The drafters of the Neutrality Act did not define the phrase "at peace" as it is used in the Act. Indeed, it does not appear that the issue was the subject of debate. However, given the underlying goals of the statute, it is reasonable to conclude that the phrase "at peace" describes the state of affairs in which there is an absence of a congressionally declared war. In a letter to Gouverneur Morris, the United States Minister to France, in 1793, Jefferson wrote:

> If one citizen has a right to go to war of his own authority, every citizen has the same. If every citizen has that right, then the nation (which is composed of all it's [sic] citizens) has a right to

go to war, by the authority of it's individual citizens. But this is not true either on the general principles of society, or by our Constitution, *which gives that power to Congress alone, & not to the citizens individually.*

6 *Writings of Thomas Jefferson, supra,* at 371, 381 (emphasis added). Yet, during President Jefferson's administration, as well as those of Presidents following him during the early years of the 19th century, Presidents repeatedly authorized military expeditions into territories against which Congress had not declared war, as well as the arming of vessels to be used against nations against which Congress had not declared war, with no indication that those Presidents, or the Congresses that were sitting at the time, understood such missions to violate the Neutrality Act.

For example, in 1801, President Jefferson dispatched naval forces to Tripoli, after the Pasha of Tripoli increased his demands for tribute to the Barbary pirates and declared war upon the United States. The United States naval action in the Mediterranean extended over a five-year period, during which Lieutenant Decatur destroyed the frigate "Philadelphia," which had been captured and converted by the Tripolitans. In 1806, after issuing a proclamation declaring that information had been received of preparations for an expedition against the dominion of Spain and warning all persons against taking any part in it,[14] President Jefferson ordered Captain Zebulon Pike and his platoon to invade Spanish Territory at the headwaters of the Rio Grande on a secret mission. In 1810, President Madison ordered the Governor of Louisiana to occupy disputed territory in West Florida, east of the Mississippi, with troops;[15] in 1813

---

[14] *See* Fenwick, *supra,* at 33.

[15] According to Abraham D. Sofaer's account of the expeditions ordered by President Madison into the Floridas and the northern coast of South America in *War, Foreign Affairs and Constitutional Power: The Origins* 296, 300, 303 (1976):

> Madison wrote Jefferson that the crisis in West Florida presented "serious questions, as to the authority of the Executive, and the adequacy of the existing laws of the U.S. for territorial administration." He expressed the fear that acting before Congress had convened would subject an executive order "to the charge of being premature and disrespectful, if not of being illegal." No response from Jefferson has been found; but, whatever Jefferson's view, Madison decided to proceed unilaterally and vigorously . . . [without congressional approval].

After President Madison presented Congress with the *fait accompli,* in the ensuing debate, Sofaer writes that Senator Clay persuaded his colleagues with the following remarks:

> The president has not, therefore, violated the Constitution, and usurped the war-making power, but he would have violated that provision which requires him to *see* that the laws are faithfully executed, if he had longer forborne to act . . . . Had the President failed to exercise the discretionary power placed in him, . . . he would have been criminally inattentive to the dearest interests of this country.

Sofaer then concludes:

> One can fairly state that Madison acted with far more independence and vigor in West Florida than his earlier conception of presidential power would have allowed. He plotted in secret, used agents and troops, threatened force, and eventually proclaimed and effectuated the occupation of an area ruled by Spain. He did these things without calling back Congress, and kept his proclamation secret until it was safely implemented. [However,] *his actions . . . were largely consistent with the view of presidential power advocated by Hamilton and most Federalists . . . . Congress had . . . provided troops, and most early Federalists would have agreed that the President had discretion to use the troops in executing any of his constitutional responsibilities.*

(Emphasis added.)

70

President Madison ordered United States Marines into Spanish Territory, and in 1816–17, on two occasions, he ordered United States forces into Spanish Florida, during the "Seminole Wars." In 1817, President Monroe sent United States forces to Amelia Island, in the Spanish Territory, to expel smugglers and privateers.

Notwithstanding the many Presidential Proclamations against American involvement in the colonial rebellions against Spain during the early 19th century, there are documented no less than seven invasions by the United States Armed Forces, ordered by Presidents Madison and Monroe, without a declaration of war or other prior congressional authorization, into Spanish Territory. In President Jackson's administration there are seven such documented expeditions into Haiti, the Falkland Islands, Argentina, Sumatra, and Peru, all nations with which the United States was at peace. Likewise, in 1837 President Van Buren ordered the Marines to capture a Mexican brig of war, and in 1839, to land in Sumatra in retaliation for attacks on American ships. In addition, President Pierce, after warning American citizens against involving themselves in civil infractions in Nicaragua, sent United States naval forces to Greytown, Nicaragua in 1853 and again in 1854 to quell civil disturbances there and to protect the lives of American citizens stationed there. Between 1840 and 1900 there were nearly one-hundred documented, and, undoubtedly, many more undocumented, instances of invasions by American forces, at the behest of the President, of nations with which the United States was at peace. *See generally* Emerson, *War Powers Legislation,* 74 W. Va. L. Rev. 53 app. (1971).

This legislative history, when considered together with the historical circumstances surrounding the passage of the Act, provides overwhelming support for the view that the Act was not intended to apply to military activities pursued, or otherwise sponsored, by the Government.[16] This conclusion is strengthened even more by the fact that Jefferson was a member of the President's Cabinet and Madison was a member of the Congress during the period in which the

---

[16] Although the question may be raised whether the drafters in fact distinguished between Presidentially authorized and congressionally approved actions in excepting from the Act's prohibitions "government-authorized" acts, the many historical examples noted in this memorandum, as well as a recognition of the necessity of ensuring the President's ability to respond rapidly to changing world events, compel us to conclude that, short of acts constituting a declaration of war, Presidential authorization is sufficient under the Act. *See also* Sofaer, *supra,* at 359. Sofaer notes that many Members of Congress came to President Monroe's defense during congressional debate regarding his actions in the Floridas, arguing that the President was not limited to fighting only wars formally declared war by Congress, but could authorize military actions short of war. Representative Alexander Smyth of Virginia remarked on the floor of the House:

> It by no means follows, as some seem to suppose, that because the President cannot declare war, that he can do nothing for the protection of the nation, and the assertion of its rights The power to declare war is a power to announce regular war, or war in form, against another Power. But it never was intended, by reserving this power to Congress, to take from the President the power to do any act necessary to preserve the nation's rights, and which does not put the nation into a state of war with another Power. If Congress, in addition to the power of declaring war, assume to themselves the power of directing every movement of the public force that may touch a neutral; or that may be made for preserving the national rights; or executing the laws and treaties; they will assume powers given to the President by the Constitution.

33 *Annals of Congress* 678 (1819).

71

Proclamation of 1793, which gave rise to the Neutrality Act, was issued and the Neutrality Act was debated and passed. Both construed the Act to apply only to unauthorized acts of private individuals and not to acts properly carried out pursuant to Presidential authority, as evidenced by their numerous military ventures, some of which are noted above, into nations with which the United States was officially at peace. Such contemporaneous interpretations of laws by "the founders of our Government and framers of our Constitution when actively participating in public affairs" has been held by the Supreme Court to be near conclusive proof of the proper construction to be accorded provisions, particularly when such interpretations are long acquiesced in. *See, e.g., J.W. Hampton, Jr., & Co.* v. *United States,* 276 U.S. 394, 411–12 (1926). *See also United States* v. *Curtiss-Wright Export Corp.,* 299 U.S. 304, 322–29 (1936); *The Pocket Veto Cases,* 279 U.S. 655, 688–90 (1929); *Myers* v. *United States,* 272 U.S. 52, 175 (1926); *Martin* v. *Hunter's Lessee,* 14 U.S. (1 Wheat.) 304, 351–52 (1816); *Stuart* v. *Laird,* 5 U.S. (1 Cranch) 299, 309 (1803).[17]

Moreover, given the Act's purpose to enhance the President's ability to implement the foreign policy goals that have been developed by him, with appropriate participation by Congress, it would indeed be anomalous to interpret the Act to prohibit Government officials, acting properly within the course and scope of their authority, from carrying out the orders of the President, "the sole organ of the nation in its external relations and its sole representative with foreign nations" in pursuit of those goals. *See United States* v. *Curtiss-Wright Export Corp.,* 299 U.S. at 319. Although the fact that the Act was not intended to apply to government-sponsored activity was not made explicit in the Act's text, our view is supported by the general rule of statutory construction, which holds that unless affirmative reasons indicate otherwise, "statutes which in general terms divest pre-existing rights or privileges will not be applied to the sovereign without express words to that effect." *United States* v. *United Mine Workers,* 330 U.S. 258, 272 (1947). *See also Hancock* v. *Train,* 426 U.S. 167 (1961). For these reasons, we believe that the purposes of the Act, as expressed by President Washington, his Cabinet, and the Members of Congress, together with the undeniable history of government-sponsored military expeditions into countries with which the United States has been at peace, and subsequent legislation, compels the conclusion that the Act was not intended to proscribe such official activity.

## II. Post-Enactment History: Applications of the Act

The first prosecutions for violating the various provisions of the Neutrality Act were all brought against private individuals, for knowingly committing acts of hostility, unauthorized by the Government, against nations with which the United States was at peace. *See, e.g., United States* v. *Peters,* 3 U.S. (3

---

[17] Although these cases refer to the construction of constitutional provisions, the analytical principle announced by the Court may also be used to gain insight into the proper construction of statutes.

Dall.) 121 (1795); *The Betty Carthcart,* 17 F. Cas. 651 (D.S.C. 1795) (No. 9742); *The Nancy,* 4 F. Cas. 171 (D.S.C. 1795) (No. 1898). The legal issue in these early cases focused on what constituted the "arming" of a vessel, the distinction between "commercial" and "hostile" intent, and the authority of the United States Government to define the political bodies in whose service, and against which, the prohibited acts had been committed, and not on whether the Act prohibited the Government from engaging in such activity. *See, e.g., Wiborg v. United States,* 163 U.S. 632 (1896); *United States v. Quincy,* 31 U.S. (6 Pet.) 445 (1832); *United States v. Guinet,* 2 U.S. (2 Dall.) 321 (1795); *United States v. Skinner,* 27 F. Cas. 1123 (C.C.D.N.Y. 1818) (No. 16309). *See also* 21 Op. Att'y Gen. 267 (1895); 13 Op. Att'y Gen. 177 (1869); 3 Op. Att'y Gen. 739 (1841),

In none of these early cases or opinions was there any discussion of the applicability of these provisions to expeditions led or authorized by government officials, yet, as noted above, there has been documented during this period numerous instances of military ventures by United States forces into countries with which the United States was "at peace," and, no doubt, many more instances of providing assistance to nations engaged in belligerent acts against nations with whom the United States is "at peace." *See generally* Emerson, *War Powers Legislation, supra.* Although some commentators have argued that for purposes of the Neutrality Act, a distinction should be made between the use of regular United States Armed Forces, which would not be covered, and the use of other government-sponsored "paramilitary" groups, which would be covered, *see* Lobel, *The Rise and Decline of the Neutrality Act, supra,* no historical evidence has been cited in support of this distinction.

The fact that during the years immediately following the passage of the Act, expeditions into the Central and South American territories were launched by private parties, groups of individuals acting pursuant to Presidential authority, and United States troops, and that only the individuals involved in the first category of expeditions were prosecuted, supports the view that the Act was intended to apply no more to "paramilitary" troops then to the regular "armed forces" troops, when acting under orders of the President.

To be sure, courts construing the Act during the 19th century understood its provisions to prohibit "individuals [from] being at war whilst their government is at peace":

> The rule is founded on the impropriety and danger of allowing
> individuals to make war on their own authority, or, by mingling
> themselves in the belligerent operations of other nations, to run
> the hazard of counteracting the policy or embroiling the rela-
> tions of their own government . . . . By these laws it is prescribed
> to the citizens of the United States, what is understood to be
> their duty as neutrals by the law of nations, and their duty also
> which they owed to the interest and honor of their own country.

*United States v. O'Sullivan,* 27 F. Cas. at 376 (emphasis added). *See also United States v. Three Friends,* 166 U.S. 1, 52, 53 (1897) ("[N]o nation can

73

permit *unauthorized* acts of war within its territory in infraction of its sover-
eignty . . . . [T]he act [was passed] . . . in order to provide a comprehensive code
in prevention of *acts by individuals* within our jurisdiction inconsistent with
our own authority.") (emphasis added).

Moreover, courts in the nineteenth century clearly recognized the President's
constitutional preeminence in the area of foreign policy, and the discretion
vested in him and his authorized agents by the Constitution regarding such
affairs. Although we are aware of no court decisions from the nineteenth
century ruling on challenges, brought under the Neutrality Act, to military
actions taken by the President or his agents,[18] in 1860, the circuit court for the
Southern District of New York, ruled that it was entirely lawful for the
President to order the shelling of a town in Nicaragua in 1854 that had refused
to redress damages incurred by American officials during a riot there.[19] In
rejecting a claim for damages against the naval commander who had carried
out the President's orders, the court held:

> As the executive head of the nation, the president is made the
> only legitimate organ of the general government, to open and
> carry on correspondence or negotiations with foreign nations, in
> matters concerning the interests of the country or of its citizens.
> It is to him, also, that the citizens abroad must look for protec-
> tion of person and of property, and for the faithful execution of
> the laws existing and intended for their protection. For this
> purpose, the whole executive power of the country is placed in
> his hands, under the constitution, and the laws passed in pursuance
> thereof; and different departments of government have been
> organized, through which this power may be most conveniently
> executed, whether by negotiation or by force a department of
> state and a department of the navy.
>
> *          *          *
>
> I have said, that the interposition of the president abroad, for
> the protection of the citizen, must necessarily rest in his discre-
> tion; and it is quite clear that, in all cases where a public act or
> order rests in executive discretion, neither he nor his authorized
> agent is personally civilly responsible for the consequences. As
> was observed by Chief Justice Marshall, in *Marbury* v. *Madi-
> son,* 1 Cranch [5 U.S. 137], 165 [(1803)]: "By the constitution of

---

[18] *But see Dellums* v. *Smith,* 577 F. Supp. 1449 (N.D. Cal. 1984), discussed below.

[19] The facts, as alleged, were:
>  that the community at Greytown [Nicaragua] had forcibly usurped the possession of the place,
>  and erected an independent government, not recognized by the United States, and had perpetrated
>  acts of violence against the citizens of the United States and their property, and had, on demand
>  for redress refused it, and that the defendant, under public orders from the president and
>  secretary, as a commander in the navy, and then in command of the Cyane, did cause the place to
>  be bombarded and set on fire, as he lawfully might for the cause aforesaid.

*Durand* v. *Hollins,* 8 F. Cas. 111, 111 (1860).

74

the United States, the president is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience. To aid him in the performance of these duties, he is authorized to appoint certain officers, who act by his authority, and in conformity with his orders. In such cases, their acts are his acts, and whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion."

*Durand,* 8 F. Cas. at 112. This incident, involving the use of American military power in Nicaragua, is one of seven documented instances of the use of military force by the United States in Nicaragua between 1853 and 1912, none of which was formally authorized by Congress. *See* Emerson, *War Powers Legislation, supra.* We are not aware of any instance in which there were demands or suggestions that the President's authorizing of such activities be prosecuted under the Neutrality Act.

Throughout the nineteenth and early twentieth centuries, Presidents sent American forces on innumerable military expeditions without prior congressional approval. For example, in 1853, Commodore Perry, pursuant to orders of President Pierce, led an expedition consisting of four men-of-war to Japan to negotiate a commercial treaty; and in 1854 he returned to Japan with ten armed ships to conclude the negotiations. In 1900, during the Boxer Rebellion, President McKinley ordered 5,000 troops to China to join the international military force protecting foreign legations; and in 1918, President Wilson committed 8,000 American troops to the Allied effort in Russia to counter the Bolshevik Revolution. *See generally* Emerson, *War Powers Legislation, supra.* In none of these instances were allegations of violations of the Neutrality Act raised by either Congress or the American public.

Prior to the court's recent ruling in *Dellums* v. *Smith,* 577 F. Supp. 1449 (N.D. Cal. 1984), discussed in Part III below, the only instance in the Act's history of nearly two centuries in which a court had considered the question of its applicability — in particular, the applicability of § 5 (18 U.S.C. § 960) — to expeditions "authorized" by the Government involved a claim by private individuals, strenuously denied by the Government, of Government complicity in their mission. *See United States* v. *Smith,* 27 F. Cas. 1192 (C.C.D.N.Y. 1806) (No. 16342). In that case, Smith defended against the charge that he had set out on an expedition "against the dominions of Spain in South America," in violation of § 5, *id.* at 1233, by arguing that the expedition "was begun, prepared, and set on foot with the knowledge and approbation of the President of the United States, and . . . of the Secretary of State of the United States." *Id.* at 1196. Although Administration officials disavowed any knowledge of Smith's expedition, the court charged the jury to determine Smith's guilt or innocence without regard to the President's alleged approval or disapproval of the ven-

ture, because the President "cannot control the statute, nor dispense with its execution, and still less can he authorize a person to do what the law forbids." *Id.* at 1230. The Court stated:

> If, then, the president knew and approved of the military expedition set forth in the indictment against a prince with whom we are at peace, it would not justify the defendant in a court of law, nor discharge him from the binding force of the act of congress; because the president does not possess a dispensing power. Does he possess the power of making war? That power is exclusively vested in congress.

*Id.*

As Smith was on a private mission, completely unrelated to the conduct of the official foreign policy of the United States, the court's language is *dicta*. Nevertheless, the *Smith* decision constitutes a single piece of data, in a voluminous body, concerning the Neutrality Act which appears to be inconsistent with our construction of the Act and our reading of the Act's legislative history. We believe that to the extent the court's language implies that the Act was intended to criminalize military endeavors directed by the President which are consistent with the Government's overall foreign policy agenda as developed by the President with appropriate participation by Congress, this decision is incorrectly decided. Moreover, its precedential value is completely undermined by contrary logic, legislative history, statutory construction principles, and historical practice. As discussed at considerable length above, it seems clear that the Act was intended to punish only *unauthorized* expeditions, undertaken by individuals acting in a private capacity, which would contravene or undermine the official foreign policy of the United States.[20]

The foregoing constitutes a survey of contemporaneous and other[21] historical constructions of the language of the Act's provisions. Although this history,

---

[20] This conclusion is particularly reinforced in the *Smith* case by reference to the fact that the prosecution was brought by President Jefferson, "with the concurrence of Mr. Madison, secretary of state," for committing private acts, inconsistent with United States foreign policy, in violation of the sovereignty of the federal government. *See United States* v. *O'Sullivan,* 27 F. Cas. at 375 (discussing *Smith*). Clearly, as evidenced by the foregoing history of numerous military ventures launched by both Jefferson and Madison (after the latter became President in 1809), the prosecution was brought *precisely because* Smith's acts were unauthorized Regarding President Jefferson's having instituted the *Smith* prosecution, the *O'Sullivan* court concluded, "so it seems the policy and intent of this law has always been understood by the executive under every administration." *Id.* at 376.

[21] In 1917, the Act was supplemented by the addition of several related neutrality provisions passed in an Act commonly referred to as the "Espionage Act," 40 Stat. 217.

One of the neutrality provisions enacted as a part of the Espionage Act is presently codified at 18 U.S.C. § 956, which prohibits "two or more persons within the jurisdiction of the United States [from] conspir[ing] to injure or destroy specific property situated within a foreign country and belonging to a foreign government . . . with which the United States is at peace." Only one prosecution appears to have been brought under this provision, *United States* v. *Elliott,* 266 F. Supp. 318 (S.D.N.Y. 1967), and in that case, the defendant raised selective prosecution and equal protection claims. In dismissing those claims, the court stated:

> He has not offered evidence even touching upon an example of any other person who conspired
> to destroy property in any nation with which the United States was clearly at peace and who was
> Continued

76

with few exceptions, supports the view that the Act was not intended to proscribe military expeditions undertaken by the Government, the strongest support for this position may be in the more recent history of extensive covert "paramilitary" activity, authorized by the President and carried out by his agents, with varying degrees of disclosure to Congress, in nations against which Congress has not declared war. We turn now to that history.

## III. Contemporary History of the Act

No recent President has refused to commit United States regular armed forces or "paramilitary" operatives, depending upon the need, to actual hostilities because of a lack of congressional declarations or approval when, in the exercise of his "inherent" powers over the conduct of foreign affairs,[22] and in the fulfillment of his constitutional duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, and of his role as "Commander-in-Chief of the Army and Navy of the United States," *id.* § 2, it is his judgment that such action is necessary to preserve the national security of the United States. Among the more well-known examples of such actions are those of President Truman in Korea, President Eisenhower in Lebanon, President Kennedy in Cuba and Southeast Asia, Presidents Johnson and Nixon in South-

---

[21] (. . . continued)
> not prosecuted. Instead, he has raised *situations such as North Vietnam or the Bay of Pigs where government complicity would effectively bar any prosecution.*

*Id.* at 324 (emphasis added).

The other set of provisions enacted with the espionage laws authorized the President, "[d]uring a war in which the United States is a neutral nation" to enforce the United States' posture of neutrality by requiring "owner[s], master[s], or person[s] in command" of any vessels within the jurisdiction of United States ports to "furnish proof satisfactory to the President, or to the person duly authorized by him, that the vessel will not be employed . . . to commit hostilities upon the subjects . of any foreign prince or state . . . with which the United States is at peace . . . and that the said vessel will not be sold or delivered to any belligerent nation, . . . within the jurisdiction of the United States, or, having left that jurisdiction, upon the high seas." 40 Stat. at 221–22; 18 U.S.C. § 963. *See also* 18 U.S.C. §§ 964–967. Section 964 provides in part that

> [d]uring a war in which the United States is a neutral nation, it shall be unlawful to send out of the United States any vessel built, . . . as a vessel of war . . . with any intent or under any agreement or contract that such vessel will be delivered to a belligerent nation, . . . or with reasonable cause to believe that the said vessel will be employed in the service of any such belligerent nation after its departure from the jurisdiction of the United States.

Section 964 codifies the substantive rule of international law forbidding the delivery of armed vessels to belligerent powers by neutral nations that § 963 authorized the President to enforce. *See* H.R. Rep. No. 30, 65th Cong , 1st Sess. 9 (1917).

In 1940, Attorney General Jackson construed this provision to preclude the President from dispatching to the British Government, in exchange for certain services pursuant to an Executive Agreement, "mosquito boats" which were at the time under construction for the United States Navy, because they would have been "built, armed, or equipped with the intent, or with reasonable cause to believe, that they would enter the service of a belligerent after being sent out of the jurisdiction of the United States." 39 Op. Att'y Gen. 484, 496 (1940). Although some commentators have suggested that Attorney General Jackson's opinion supports the view that all of the Neutrality Act provisions were intended to apply to Government activities, we believe that § 964 by its terms is limited to circumstances involving a declared war, unlike the other neutrality laws, and was proposed to Congress by Attorney General Gregory in 1917 for the purpose of providing "for the observance of obligations imperatively imposed by international law upon the United States." H.R. Rep. No. 30, *supra,* at 9.

[22] *See United States* v *Curtiss-Wright Export Corp.,* 299 U.S. 304 (1936)

77

east Asia and Chile, President Ford in Angola, and President Carter in Iran. *See generally* Senate Select Comm. to Study Governmental Operations with respect to Intelligence Activities, Final Report on "Foreign And Military Intelligence," S. Rep. No. 755, 95th Cong., 2d Sess. (Book I) (1976) (Church Committee Report); Emerson, *War Powers Legislation, supra;* Monaghan, *Presidential War-Making,* 50 B.U. L. Rev. 19 (1970).[23]

Although all of these actions generated some controversy — in fact, one may fairly say that virtually all of them generated heated debate and remain controversial today — no significant doubt was ever cast on the legality of the President's conduct under the Neutrality Act.

In addition to the numerous documented uses of troops by Presidents without congressional authorization, the Eisenhower, Kennedy and Johnson administrations alone conducted over 400 covert military operations in countries with which the United States was "at peace," including Laos, Angola and Cuba. Church Committee Report, *supra,* at 46.[24] In none of the many instances of such action has there been raised a credible allegation or serious debate in Congress regarding possible violations of the Neutrality Act.

Moreover, there is strong contemporary evidence that the Neutrality Act is not regarded by Congress as applying to military deployments by the President or covert activities of the Central Intelligence Agency or the Department of Defense. This evidence takes the form of the recent enactment by Congress of provisions to "regulate" the President's use of the regular armed forces and of covert operations conducted by the CIA and the Department of Defense. The War Powers Resolution,[25] the Hughes-Ryan Amendment to the 1974 Foreign Assistance Act,[26] the Intelligence Authorization Act,[27] the "Boland Amend-

---

[23] Less well-remembered examples include President Eisenhower's evacuation of United States nationals from Egypt during the Suez crisis in 1956; the 5,000 troops that President Eisenhower sent to Beirut to "protect American lives" and "assist" Lebanon in preserving its political independence during Lebanon's civil "strife" in 1958; and President Johnson's "airlift" actions in the Congo in 1964 during the civil rebellion in that country as well as his deployment of troops in the Dominican Republic in 1965. *See* Emerson, *War Powers Legislation, supra.*

[24] "Covert action" was defined by the Senate Select Committee on Intelligence Activities as "clandestine activity designed to influence foreign governments, events, organizations or persons in support of U.S. foreign policy conducted in such a way that the involvement of the U.S. Government is not apparent." Church Committee Report, *supra,* at 131.

[25] In brief, the War Powers Resolution, 50 U.S.C. §§ 1541–1548, purports to require the President to report to Congress within 48 hours of introducing U.S. Armed Forces, *inter alia,* "into hostilities or into situations where imminent involvement in hostilities is clearly indicated by the circumstances," and to terminate such use within 60 days, unless Congress has declared war or enacted a specific authorization for such use.

[26] The Hughes-Ryan Amendment, 22 U.S.C. § 2422, provides:

No funds appropriated under the authority of this or any other Act may be expended by or on behalf of the Central Intelligence Agency for operations in foreign countries, other than activities intended solely for obtaining necessary intelligence, unless and until the President finds that each such operation is important to the national security of the United States and reports, in a timely fashion, a description and scope of such operation to the appropriate committees of the Congress, including the Committee on Foreign Relations of the United States Senate and the Committee on Foreign Affairs of the United States House of Representatives.

[27] The Act, 50 U.S.C. § 413(a)(1), continued the Hughes-Ryan Amendment's executive reporting requirement, but limited the reporting to the Senate and House Select Committees on Intelligence. It also provided that the Director of Central Intelligence had to give prior, instead of timely, notice of "any significant

Continued

ment" to the Further Continuing Appropriation Act of 1983,[28] and the similar restrictions adopted by Congress in the Intelligence Authorization Act for Fiscal Year 1984,[29] all purport to impose various reporting requirements and expenditure limits on the President regarding the conduct of military activities, which necessarily embrace activities that would otherwise be prohibited by the Neutrality Act if carried out by individuals acting without Government authorization.

These provisions constitute an explicit recognition by Congress of the President's authority to conduct such activities against countries with whom the United States is "at peace" within the meaning of the Act. The Church Committee, after extensive hearings and exhaustive study of the matter over a period of fifteen months, concluded:

> The argument that through the provision of funds to the CIA Congress has effectively ratified the authority of the CIA to conduct covert action rests on the assumption that . . . Congress has known that the CIA was engaged in covert action and has provided funds to the CIA with the knowledge and intent that some of the funds would be used for covert action.
>
> *     *     *
>
> One of the reasons offered for the 1974 Amendment to the Foreign Assistance Act was that it would ensure that Congress would have sufficient information about covert action to determine if such activities should continue.
>
> * * *
>
> [A]lthough the actual state of congressional knowledge about covert action prior to the 1970s is unclear[,] Congress . . . now knows that the CIA conducts covert action. Congress also knows that the Executive claims Congress has authorized the Agency

---

[27] (. . . continued)
anticipated intelligence activity." Only under extraordinary circumstances is the President authorized not to provide a full report to these committees, and even then he must (a) report to the chairman and ranking minority member of each committee and other leaders of Congress, (b) provide notice in a timely fashion subsequent to the covert operation taking place, and (c) provide a statement of the reasons for not giving prior notice. 50 U.S.C § 413(a), (b).

[28] The Boland Amendment to the Act, Pub. L. No. 97–377, 96 Stat. 1830, 1865, provided:
> None of the funds provided in this Act may be used by the Central Intelligence Agency or the Department of Defense to furnish military equipment, military training or advice, or other support for military activities, to any group or individual, not part of a country's armed forces, for the purpose of overthrowing the Government of Nicaragua or provoking a military exchange between Nicaragua and Honduras.

[29] The 1984 restriction provides:
> During fiscal year 1984, not more than $24,000,000 of the funds available to the Central Intelligence Agency, the Department of Defense, or any other agency or entity of the United States involved in intelligence activities may be obligated or expended for the purpose or which would have the effect of supporting, directly or indirectly, military or paramilitary operations in Nicaragua by any nation, group, organization, movement, or individual.

Pub. L. No. 98–215, 97 Stat. 1475.

to do so. Finally, Congress knows that the CIA receives its funds through secret transfers of funds appropriated to the Department of Defense and that some of the transferred funds are used to finance cover the action. In the future the failure by Congress to prohibit funds from being used for covert action by the CIA would clearly constitute congressional ratification of the CIA's authority, eliminating any ambiguity.

Church Committee Report, *supra,* at 498, 499, 501 (footnotes omitted).

Moreover, these provisions were enacted with virtually no discussion of the Neutrality Act, which suggests that Congress did not view the Act as being relevant to Presidentially authorized expeditions, whether they be covert activities of the Central Intelligence Agency or the Department of Defense, or overt activities of the United States Armed Forces. In addition, such legislation constitutes a recognition by Congress of the historic practice of Chief Executives, as well as of the changing nature of military operations and the increasing complexity in foreign alliances, which require the President to be able to respond immediately to world crises and threats to national security, short of usurping Congress' constitutional prerogative to declare war.[30]

Notwithstanding the overwhelming support for the view that the Act was not intended to apply to Government officials acting pursuant to Presidential orders, and particularly in view of the recent explicit congressional authorizations of CIA activity in foreign countries noted above, the United States District Court in *Dellums* v. *Smith,* 577 F. Supp. 1449 (N.D. Cal. 1984),[31] recently ordered the Attorney General to conduct a preliminary investigation, pursuant to Title VI of the Ethics in Government Act, 28 U.S.C. §§ 591–598, to determine whether allegations that Government officials had violated the Neutrality Act by their recent actions in Nicaragua warranted application for the appointment of an independent counsel under the Ethics in Government Act. Although not directly deciding that issue, the court noted that "the history of the Neutrality Act and judicial precedent demonstrate the reasonableness of the view that the Act applies to all persons, *including the President.*" 577 F. Supp. at 1454 (emphasis added). The action was brought as a mandamus action by a Member of Congress, in his capacity as a private citizen, and two other citizens, alleging that they had sustained various injuries from the Government's activities concerning Nicaragua, to compel the Attorney General to conduct a pre-

---

[30] When asked about the applicability of the Neutrality Act to covert activities carried out during the Kennedy Administration, Attorney General Robert Kennedy replied:

> There have been a number of inquiries from the press about our present neutrality laws and the possibility of their application in connection with the struggle for freedom in Cuba.
>
> First, may I say that the neutrality laws are among the oldest laws in our statute books. Most of the provisions date from the first years of our independence and, with only minor revisions, have continued in force since the 18th century. *Clearly they were not designed for the kind of situation which exists in the world today.*

Statement of Attorney General Kennedy to the Press (Apr. 20, 1961) (*cited in* Lobel, *The Rise and Decline of the Neutrality Act, supra,* 24 Harv. Int'l L. J. at 44 n.243.)

[31] *See also Dellums* v. *Smith,* 577 F. Supp. 1456 (N.D. Cal. 1984) (denial of stay); *Dellums* v. *Smith,* 573 F. Supp. 1489 (N.D. Cal. 1983).

liminary investigation, pursuant to the Ethics in Government Act, into whether the President and other Executive Branch officials had violated the Act. In concluding that the Neutrality Act could reasonably be construed to proscribe official Government activity, for purposes of invoking the Ethics in Government Act,[32] the court relied primarily on *United States* v. *Smith*, the deficiencies of which we have noted above.[33] Although *Dellums*, unlike the *Smith* case, cannot be dismissed as not involving truly "official" Government conduct, we nevertheless believe that the case was erroneously decided. The United States Court of Appeals for the Ninth Circuit has stayed the district court's order pending resolution of the issue on appeal.[34]

## Conclusion

As we have demonstrated, the Neutrality Act was enacted primarily to protect the territorial sovereignty and independence of the United States from foreign entanglements during the early years of its history, as well as to enhance its ability to conduct a unified and consistent foreign policy, unimpeded by the acts of individual citizens. That purpose has remained constant through its several amendments and codifications over the last two centuries. With the two possible exceptions noted in this memorandum of district court decisions, the Act has been consistently construed by Presidents, Congresses, and judges to apply to unauthorized acts of individuals. All prosecutions brought under the Act have been brought against individuals on unauthorized missions pursuing private "foreign policy" goals. Although the fact that the Act was not intended to apply to Government officials acting within the course and scope of their official duties was not made explicit in the text of the Act, we believe that the historical circumstances surrounding its enactment, together with the historical practice of Presidents from times contemporaneous with the Act's passage to the present day, compel the conclusion that neither § 960 of the Act, nor any of its other provisions, impose criminal sanctions on the activities carried on by the Central Intelligence Agency and its agents, under the President's direction, in Nicaragua.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[32] The court stated·

The present question is thus limited to whether the view is reasonable that the Neutrality Act proscribes the activities alleged by plaintiffs. For reasons set forth below, the question must be answered in the affirmative.

577 F. Supp. at 1452.

[33] The other evidence cited by the court in support of its conclusion appeared to be lifted, wholesale, out of plaintiff's brief without any further consideration. Even given this, the court intimated an ambivalent view of the evidence, when it noted that "[t]he contention that the Neutrality Act reaches executive officials is at least as persuasive as defendant's claim that it does not " 577 F  Supp. at 1452.

[34] NOTE: After this opinion was issued by the Office of Legal Counsel, the court of appeals reversed the district court's decision in *Dellums* on the ground that the plaintiffs lacked standing to bring the action. *See* *Dellums* v. *Smith*, 797 F.2d 817 (9th Cir. 1986)